**UNITED STATE DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| **RICHARD MILLER,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **DALE MCCORMICK, MAINE STATE** | )    Civil Action No.CV-08-26-B |
| **HOUSING AUTHORITY, and PENQUIS** | ) |
| **COMMUNITY ACTION PROGRAM,** | ) |
| **Defendants** | ) |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON HIS COMPLAINT**

Plaintiff first moves for summary judgment on counts I and II of his complaint based on the stipulated record submitted along with this motion.

**I.      Statement of the Case**

Richard Miller is suing Defendants under 42 U.S.C. § 1983 because the Defendants, acting under color of state law, refuse to pay his housing subsidy under the federal "Section 8" program despite two separate decisions by their own Administrative Hearing Officer (AHO) that the subsidy had to continue. Twelve years ago, Mr. Miller was convicted of molesting a child in Washington State and served time in prison for that offense. As a result, he is a registered sex offender. However, for six years he has been a lawful "participant" in the Section 8 program, initially in Massachusetts and, since 2005, in Maine. The underlying issue in this case is whether, under the Section 8 regulations, Defendants can terminate Section 8 benefits to a lawful participant in the program because of a sex offense that occurred six years prior to participation. The primary legal question is whether the Defendants have violated Mr. Miller's rights under the

federal housing act and the due process clause of the United State Constitution by ignoring the decisions of their own hearing officer and unilaterally terminating Mr. Miller's benefits without specifying a reason or giving him an opportunity to be heard.

At the time Defendants learned of Mr. Miller's 1996 conviction and sex offender status, he was in the process of moving from an apartment subsidized under the Section 8 program to a purchased home with a subsidized mortgage under the Section 8 Homeownership Program.[1] Defendants then began a relentless effort to terminate his subsidy and remove him from the program. However, they struggled to find a legal theory that would allow them to do so. The Section 8 program regulations specify the allowable grounds for termination of participant benefits, and none of those grounds apply to Mr. Miller. While the Section 8 Regulations currently require all housing authorities to establish standards that prohibit the admission of lifetime sex offender registrants into the program, the law is equally clear that lawful participants cannot be terminated for this reason.

Defendants initially alleged that Mr. Miller (1) had "committed fraud" and (2) had engaged in "criminal activity that threatens the health, safety, or right to peaceful enjoyment of other residents . . . by failing to register on the sex offender registry." (Exhibit 22).[2]

Mr. Miller requested an administrative hearing. (Fact 9). After a contested hearing, the AHO determined (1) that there was no evidence of fraud or of any false statements either at Mr. Miller's initial acceptance into the Section 8 Program or when he transferred his participant status to Maine and (2) that since the crime of failing to register was one of strict liability and there was no evidence of any threat to the health, safety, or right to peaceful enjoyment by other

---

[1] The Section 8 Homeownership program is part of the larger Section 8 Voucher Program, and the rules for termination of participation are exactly the same.

[2] The Stipulated Record includes stipulated facts and 37 documents which the parties agree exist and are relevant and to which reference can be made by the parties and the Court in the argument and resolution of this matter. References to stipulated facts will be to "Fact _", while documents will be referenced as "Exhibit _".

2

residents or those residing nearby, there were no grounds for termination for that reason. (Exhibit 23). The AHO ordered that "The participant's subsidy shall not be terminated."

Shortly after the issuance of that decision, Defendants tried again, this time alleging that Mr. Miller had "committed violent criminal activity" and referencing his 1996 conviction. (Exhibit 24). A second administrative hearing followed, with the same result. The AHO determined (1) that the MSHA Administrative Plan did not allow for termination of a participant's benefits because of a participant's status as a sex offender registrant, (2) that the record did not establish that Mr. Miller's crime was "violent", and (3) that anyway a participant's benefits could not be terminated for violent criminal activity that predated participation in the program.[3] Once again, the AHO ordered that "The participant's subsidy shall not be terminated." (Exhibit 25).

At that point, Defendants appear to have given up on the administrative hearing process. Instead, they decided to simply ignore the hearing decisions, and they refused to pay Mr. Miller's subsidy, asserting that the hearing decisions were "contrary to HUD regulations or requirements or otherwise contrary to federal and state law", without specifying what regulation, requirement, or law was violated. (Exhibit 26). This action followed.

## II.  Facts

This case is being submitted with a stipulated record which includes stipulated facts. Hence, no additional recitation of the facts is included in this document.[4]

## III.  Discussion

### A.  Statutory and Regulatory Provisions of The Section 8 Housing Voucher Program

---

[3] This is consistent with the federal regulations and Defendants' own administrative plan which contain specific rules for collecting information on and considering pre-existing criminal activity at the time of application.

[4] Plaintiff also assumes that the Stipulated Record takes the place of the usual Statement of Material Facts generally required by Rule 56 of the Rules of the United States District Court for the District of Maine.

The Section 8 Housing Voucher Program is established by 42 U.S.C. §1437f. Its purpose is to help low-income families and individuals obtain a "decent place to live." 42 U.S.C. § 1437f(a). The implementing regulations are found at 24 C.F.R. Part 982. The program generally allows recipients to find a landlord in the private housing market, and the government subsidizes the rent. In order to accomplish this, the Secretary of the Department of Housing and Urban Development (HUD) enters into contracts with state and local public housing agencies (PHAs) and funds them. *See* 42 U.S.C. § 1437f(b)(1) & (o)(1)(A). PHAs receive applications from eligible persons seeking housing assistance, approve or deny those applications, and provide vouchers to approved applicants. Under certain specified conditions, PHAs have the authority to terminate vouchers held by participants. See 24 C.F.R. §§ 982.552 and 982.553. (Exhibits 34 & 35). HUD requires PHAs to adopt a Section 8 Administrative Plan to provide standards for their specific programs. 24 C.F.R. § 982.54(a).

One of the advantages of the Section 8 Voucher Program for low-income tenants is that, in contrast to the more traditional Section 8 project-based or public housing options, voucher holders can move with their vouchers anywhere in the United States where there is a PHA. 42 U.S.C. §1437f(o). The federal regulations at 24 C.F.R. §§982.353 & 982.355 explain this "portability" program and the process through which the "initial PHA" and "receiving PHA" divide costs and responsibility.

> "A voucher-holder or participant family has the right to receive tenant-based voucher assistance in accordance with requirements of this part to lease a unit outside the initial PHA jurisdiction, anywhere in the United States, in the jurisdiction of a PHA with a tenant-based program under this part."[5]

 24 C.F.R. §§982.353(b).

---

[5] This right is subject to only a few restrictions. Some families must complete 12 months in the initial PHA's jurisdiction, and a family cannot move when in violation of an assisted lease.

4

Defendant Maine State Housing Authority is the public housing authority (PHA) administering Mr. Miller's Section 8 benefits. (Fact 2 & Exhibits 15 & 16). Defendant Penquis Community Action Program (hereinafter "Penquis CAP") is a non-profit corporation in the State of Maine and administers the Section 8 Housing Voucher Program on behalf of MSHA in Penobscot and Waldo counties. (Fact 4).

**B.     Plaintiff has a right of action under 42 U.S.C. §1983 to enforce the Defendants' failure to provide procedures consistent with the statute and regulations**.

Plaintiff's complaint alleged causes of action under 42 U.S.C. §1983 for violation of his rights under the Fourteenth Amendment to the United States Constitution and his rights under federal housing law. There is no question but that Section 1983 is the proper vehicle for enforcement of constitutional rights.

> The First [***270] Amendment, the Equal Protection and [*120] Due Process Clauses of the Fourteenth Amendment, and other provisions of the Federal Constitution [**1066] afford protection to employees who serve the government as well as to those who are served by them, and § 1983 provides a cause of action for all citizens injured by an abridgment of those protections.

Collins v. City of Harker Heights, 503 U.S. 115, 119-120 (U.S. 1992)

Other federal rights must be unambiguously conferred by Congress to support a §1983 claim. Gonzaga University v. Doe, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). In Wright v. Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 93 L. Ed. 2d 781, 107 S. Ct. 766 (1987), the Supreme Court allowed a §1983 suit by tenants to recover past overcharges under a rent-ceiling provision of the Public Housing Act. Wright was cited with approval in Gonzaga. Supra, 536 U.S. 273, 280.

> "42 U.S.C. § 1437d(k) mandates the creation of procedural rights for tenants faced with adverse action. The language of the statute unambiguously confers rights for the benefit of Section 8 subsidy recipients."

Gammons v. Mass. Dep't of Hous. & Cmty. Dev., 523 F. Supp. 2d 76, 85 (D. Mass. 2007).

## C. The regulation relied on by Defendants to ignore their own AHO's decision is narrowly tailored and does not permit a hearing decision to be disregarded under the circumstances of this case.

> A "mandatory informal hearing procedure is more than a mere courtesy but is founded on due process principles. Only in those cases where the family is to be deprived of an entitlement does due process become important. See Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970). The Federal courts have applied the Goldberg case to eviction or actions leading to eviction of tenants of federally subsidized housing programs. See Ferguson v. Metropolitan Dev. & Hous. Agency, 485 F. Supp. 517, 521-524 (M.D. Tenn. 1980) (applying the constitutional rubric of Goldberg to the deprivation of section 8 benefits by a PHA)."

Wojcik v. Lynn Hous. Auth., 66 Mass. App. Ct. 103; 845 N.E.2d 1160; 2006 Mass. App. LEXIS 422.

When a PHA proposes to terminate Section 8 assistance to a participant family, it is required to give the family an opportunity for an administrative hearing with certain specified rules on notice and the opportunity to be heard. 24 CFR 982.555(a). When a PHA is required to provide a hearing and a family takes advantage of that opportunity, the PHA is bound by the decision of the hearing officer except in very rare situations, as follows:

> (f) Effect of decision. The PHA is not bound by a hearing decision:
>
> (1) Concerning a matter for which the PHA is not required to provide an opportunity for an informal hearing under this section, or that otherwise exceeds the authority of the person conducting the hearing under the PHA hearing procedures.
>
> (2) **Contrary to HUD regulations or requirements, or otherwise contrary to federal, State, or local law**.
>
> (3) If the PHA determines that it is not bound by a hearing decision, the PHA must promptly notify the family of the determination, and of the reasons for the determination.

6

24 CFR 982.555(f) (emphasis supplied). (Exhibit 37).

"The regulations confine the PHA's review, as mentioned above, to whether the decision of the hearing officer was '[c]ontrary to HUD regulations or requirements, or otherwise contrary to federal, State, or local law.' 24 C.F.R. § 982.555(f)(2). This does not create a right in the PHA to conduct a de novo review of the hearing officer's decision." Wojcik v. Lynn Hous. Auth., supra at 114.

Defendants seek generally to ground their decision not to follow the rulings of their own AHO on subsection (2) above. Defendant MSHA stated in its letter of June 6, 2007, that it had "determined that it will not be bound by the decisions of January 30, 2007 and May 29, 2007 as they are contrary to HUD regulations or requirements or otherwise contrary to federal and state law." (Fact 26 & Exhibit 26). Since Defendants cannot rely in this case on any grounds not presented to the AHO, because to do so would clearly violate Mr. Millers' due process rights by denying him the opportunity for a hearing on those grounds, they must point to a particular regulation, requirement, or law to which the AHO's decisions are contrary. Defendants have never done so.[6] (Fact 26 & Exhibit 26). Instead, they simply stopped paying Mr. Miller's subsidy. (Fact 27).

In order to terminate Mr. Miller's Section 8 benefits; Defendants need to show more than that the AHO's decisions are contrary to a specific law or regulation. They must also point to a law or regulation that requires termination of Mr. Miller's benefits as a matter of law. Otherwise, if there is any remaining dispute, the matter must go back for an administrative hearing on that issue. Similarly, if the Defendants are alleging new grounds from termination beyond what they

---

[6] This, in and of itself, is a violation of subsection (3) above, which requires the PHA to "promptly notify the family of the determination, and of the reasons for the determination." 24 CFR 982.555(f)(3).

presented in the two administrative hearings processes, they must first give Mr. Miller notice of those grounds and allow him the opportunity to be heard.

### D. The AHO did not commit any error of law.

Since Defendants renouncement of their AHOs decision was done in general terms, it is difficult to counter the specific arguments, if any, that those decisions were legally defective.

In the most recent (second) hearing, Defendants sought to terminate Mr. Miller's rights as a program participant by asserting that his prior sex offense was violent criminal activity and hence was a violation of his family obligations, under their Section 8 administrative plan and under 24 C.F.R. §§982.551 and 982.553, not to engage in violent criminal activity. (Exhibit 24). The AHO appropriately determined (1) that the family obligations only referred to "conduct during the participant's participation in the program," which Mr. Miller's offense was not, and (2) that there was no evidence that Mr. Miller's 1996 offense was "violent" within the meaning of the definition of that word in the Defendants' own administrative plan. (Exhibit 25 – compare also Exhibits 3 and 12). See Wellston Hous. Auth. v. Murphy, 131 S.W.3d 378; 2004 Mo. App. LEXIS 399 (tenant in public housing cannot be evicted for the criminal conviction of her guest that pre-dated her admission to the public housing program).

The AHO dealt with two issues in the first hearing; (1) whether Mr. Miller had committed "fraud or other corrupt or criminal act" by failing to disclose his duty to register as a sex offender, and (2) whether he had violated his family obligations as a Section 8 program participant by engaging in "criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises by failing to register on the sex offender registry."

As regards "fraud", the AHO reasoned that:

> "Although it is undisputed that Mr. Miller did not disclose his status as a sex offender, the record does not show that Mr. Miller at anytime (sic) falsely answered any question about his criminal record or his status as a sex offender, or that he was at any time made aware of any obligation to disclose that status. Therefore, it cannot be found that Mr. Miller made a false statement such as would be the basis for program fraud. Under these circumstances, it cannot be found that Mr. Miller committed program fraud or abuse such as would give MSHA, through its agent PCAP, discretion to terminate his subsidy."

(Exhibit 23).

As regards criminal activity, the AHO noted that the only potential criminal activity Mr. Miller had engaged in was a failure to register as a sex offender in Maine and that there "is no evidence in the record showing that Mr. Miller's failure to register threatened anyone's health safety (sic) or peaceful enjoyment." (Exhibit 23).

Plaintiff will not re-argue these issues herein. This Court is not sitting as an appellate body regarding those decisions, de novo or otherwise, and, as noted above, Defendants do not have a right of de novo review of the hearing decisions. <u>Wojcik v. Lynn Hous. Auth.</u>, supra at 114.

However, Defendants are clearly concerned that Mr. Miller did not initially register as a sex offender in Maine and that they did not know he was a prior sex offender. As will be discussed below, the end result of this dispute would be the same if Mr. Miller had registered immediately after moving to Maine and even if his classification as a lifetime registrant was correct. It is worth noting in this regard that Defendants have never asserted in either of their administrative attempts to terminate Mr. Miller's benefits that the status of lifetime registrant was grounds for termination. (See Exhibits 22 & 24).

**E.   Mr. Miller is not appropriately classified as a lifetime sex offender registrant.**

It appears from Defendants' Response to Plaintiff's Motion to Dismiss Counterclaim that the essence of their argument is as follows;

9

> "If MaineHousing or any PHA has the ability to deny entry into the program under 24 C.F.R. §982.553(a)(2)(i) . . . then it must have the ability to terminate such individuals who may be participants in the program without the PHA's knowledge."

Passing for a moment the failure to specify any law or regulation contrary to the AHO's decisions and the attempt to substitute the writer's logic for law, this argument is simply wrong. The Section 8 regulations clearly separate the criteria for admission to the program from the criteria for termination of the rights of existing program participants, as do other HUD housing programs. Assuming for purposes of argument that Mr. Miller's status as a sex offender is Defendants' real concern, the question becomes whether there is any law or regulation that requires termination of participants from the Section 8 program who have that status. Hence, this Memorandum will examine Section 8 program regulations to determine what effect, if any, Mr. Miller's status as a sex offender registrant has on his rights as a participant.

Initially, it is worth examining whether Mr. Miller is appropriately classified as a lifetime sex offender registrant. The AHO determined that he was not. (Exhibit 25). 24 C.F.R. §982.553(a)(2)(i), cited by Defendants as noted above, is the section of the regulations that requires PHAs to establish standards to prohibit the admission of lifetime registrants. (Exhibit 35). If Mr. Miller is not, or should not be a lifetime registrant, then there is no mandatory basis in the regulations for even denying him admission to the program, much less terminating his benefits as a participant.

Twelve years ago, Mr. Miller was convicted in the State of Washington of child molestation in the first degree. (Exhibit 1). He was sentenced to 55 months in prison, the standard range being from 51 to 68 months. (Exhibit 2). The elements of his offense were (1) sexual contact with (2) a person (3) under the age of 12. (Exhibit 3). He was required to register as a sex offender in Washington. (Exhibit 4). However, his Washington registration requirement

10

was not a lifetime one. Washington statute 9A.44.140(3)(a) allows him to petition the State of Washington Superior Court to be relieved of that duty, provided he has spent 10 years in the community without being convicted of any new offense. (Exhibit 5).[7]

Maine has only two pigeonholes for registering sex offenders; a 10-year list and a lifetime list. (Exhibit #31). For offenders convicted in Maine, it is easy to tell which list they go on because the Court makes the decision at the time of sentencing. (Exhibit 29, §11222, subsection 1). It is more difficult to determine the correct list when the conviction is from another jurisdiction and that other jurisdiction does not use a simple 10-year/lifetime distinction. The relevant Maine statute is 34-A M.R.S.A. §11225(2) & (4). (Exhibit 31). An offender from another jurisdiction must go on the lifetime list if the other jurisdiction requires a lifetime registration, while that offender would go on the 10-year list if his or her registration requirement in the other jurisdiction "is for a period of years rather than for a lifetime."

When Mr. Miller registered in Maine, he was put on the lifetime list. (Exhibit 8). However, that would appear to be a mistake on its face, as Mr. Miller's requirement in Washington is for 10 years with a right to then petition the court. (Exhibit 5).[8]

The AHO wrestled with this question in her second decision, noting the Washington State statutes, that there is no definition of "lifetime registration" in either the MSHA Section 8 administrative plan or the federal Section 8 regulations, and that the federal statute dealing with sex offender registration programs provides criteria for lifetime registration that would **exclude** Mr. Miller from that category. (Exhibit 25, pages 4 - 6).

---

[7] While interpretation of that statute is obviously best left to members of the Washington Bar, it appears that Mr. Miller is eligible to petition to be relieved of his obligation, as his conviction was more than 10 years ago.
[8] The letter included in the record as Exhibit 8 shows in which of the two possible pigeonholes Maine placed Mr. Miller, but Exhibit 8 does not meet the requirements of 34-A M.R.S.A. §11228 and hence is not evidence of the correctness of that designation.

11

Hence, Mr. Miller's designation as a lifetime registrant is legally incorrect, and the Defendants' Section 8 administrative plan would not have allowed for his exclusion even if he were merely an applicant on this basis. (Exhibit 12, subsection 5 under "Discretionary Denial for Criminal Activity or Alcohol Abuse").

**F.  While Federal regulations require PHAs to establish standards that prohibit admission of lifetime sex offender registrants to the Section 8 program, they do not provide for the termination of the benefits of program to participants whose sex offender registration status pre-dated lawful admission to the program.**

The statute creating the Section 8 program is at 42 U.S.C. §1437f. The extensive regulations which implement the statute and describe the program are at 24 C.F.R. Part 982, with the general definitions for the program found in 24 C.F.R. §982.4. An "applicant" is:

> "A family that has applied for admission to a program but is not yet a participant in the program."

A "participant" is:

> "A family that has been admitted to the PHA program and is currently assisted in the program. The family becomes a participant on the effective date of the first HAP contract executed by the HA for the family (first day of initial lease term)."

24 C.F.R. §982.4(b). [9]

One of the advantages of the Section 8 program over government-owned housing programs is that, within certain guidelines, participants may move around the country with their vouchers. This process is called "porting". The process of porting from one jurisdiction to another does not change a participant back into an applicant. 24 C.F.R. §982.355 expressly provides that:

---

[9] A "family" for purposes of the Section 8 Housing Voucher Program can include single individuals such as Mr. Miller. 24 C.F.R. §982.201(c)(1).

> The receiving PHA does not redetermine elibibility (sic) for a portable family that was already receiving assistance in the initial PHA Section 8 tenant-based program (either the PHA voucher program or certificate program).

The federal rules on denial of assistance to applicants and termination of assistance to participants are found at 24 C.F.R. §§982.551 - 982.553. "Refusing to process or provide assistance under portability procedures" for a participant acts as a termination of assistance under 24 C.F.R. §982.552(a)(3).[10]

In keeping with the distinction between applicants and participants, the rules for "denial of admission" and "termination of assistance" are in separate subsections of 24 C.F.R. §982.553. Similarly, the appeal rules for applicants are found in 24 C.F.R. §982.554 (informal review), while the appeals rules for participants are found in 24 C.F.R. §982.555 (informal hearing). (Exhibits 35, 36, & 37).

24 C.F.R. §982.553(a), which addresses "denial of admission," specifically discusses lifetime sex offender registrants. Under the heading "Prohibiting admission of other criminals[11] – (i) mandatory prohibition", 24 C.F.R. §982.553(a)(2) states that "[T]he PHA must establish standards that prohibit admission to the program if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program."

24 C.F.R. §982.553(b), which addresses "termination of assistance," in contrast to subsection (a) on denial of admission, does not include sex offender registration status as a ground for termination. Under the heading "[T]erminating assistance for other criminals," 24

---

[10] "Refusing to process or provide assistance under portability procedures" can also act as a denial for an applicant. 24 C.F.R. §982.552(a)(2). Generally, however, a refusal to assist with porting would apply only to participants, although initial applicants can port from the initial PHA's jurisdiction if they are a resident of that jurisdiction when they apply. See note 4 above, 24 C.F.R. §982.353(c), and 24 C.F.R. §982.355(c), which provides that "for a portable family that was not already receiving assistance in the PHA tenant-based program, the initial PHA must determine whether the family is eligible for admission to the receiving PHA voucher program." See also <u>Lawrence v. Town of Brookhaven Dep't of Hous.</u>, 2007 U.S. Dist. LEXIS 94947 (D.N.Y. 2007) for some discussion of "terminating" as opposed to "denying" in the context of porting Section 8 Voucher Program benefits.

[11] For purposes of federally assisted housing programs, "other criminals" means any criminal who is not a drug criminal.

13

C.F.R. §982.553(b)(2) provides for the termination of assistance for participants who engage in certain criminal activity in violation of their "family obligations," but does not include pre-existing crimes or sex offender registrant status as a ground for termination. *See* 24 C.F.R. §982.551(l).

The "mandatory prohibition" regarding lifetime sex offender registrants in 24 C.F.R. §982.553(a)(2), therefore, only covers applicants and is not relevant to participants. Furthermore, the regulation simply requires PHAs to establish standards in their administrative plans to perform criminal background checks and then deny admission to applicants who are subject to a lifetime sex offender registration requirement. It does not impose a uniform federal eligibility requirement, but instead allows local PHAs some flexibility in their administrative plans. [12]

The inclusion of prior sex offender registration status as a ground for denial, but not as a ground for termination, is not inadvertent. For certain drug-related crimes, a conviction that pre-dates a participants' involvement with the program can result in both denial of an applicant or termination of a participant. For example, the rules expressly prevent admission, and require immediate termination, "if the PHA determines that any member of the household **has ever been** convicted of drug-related activity for manufacture or production of methamphetamine on the premises of federally assisted housing." (Emphasis added). Compare 24 C.F.R. §982.553(b)(1)(ii) and 24 C.F.R. §982.553(a)(1)(ii)(C). (Exhibit 35). A similar mandatory termination provision for lifetime sex offender registration status could obviously have been included, but was not.

Hence, while lifetime sex offender registration status can be a ground for denial of admission to the Section 8 Program, it cannot be a ground for termination of participation. This

---

[12] Mr. Miller's admission into the Section 8 Housing Voucher Program in Massachusetts would have been based on the initial PHA's admission process under their administrative plan.

14

legal conclusion is consistent with HUD's rules for other types of federally assisted housing. 24 C.F.R. §§5.850 et. seq. contains the rules for denying admission to, and terminating tenancies in, most types of federally assisted housing.[13] The Section 8 Housing Voucher Program is expressly excluded from those rules because of the "similar provisions" in 24 C.F.R. Part 982. As with the Part 982 rules examined above, 24 C.F.R. §§5.856 requires owners to "establish standards that prohibit admission to federally assisted housing if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program." However, 24 C.F.R. §§5.859, which covers termination of federally assisted tenancies for families already in a program, does not include a provision for terminating assistance for participants who are subject to a lifetime registration requirement.

As noted above, all PHAs are required by regulation to have an administrative plan to govern their specific Section 8 program. 24 C.F.R. § 982.54(a). Defendant MSHA is a PHA and has an administrative plan for its Section 8 program. (Exhibits 12 & 13).[14] Consistent with the discussion above, the MSHA Section 8 administrative plan contains very different criteria for denial of admission as opposed to termination of assistance. (Compare Exhibits 12 & 13). As pertains to the present case, in subsection 6 under the "mandatory denial" heading, an applicant who is subject to a lifetime registration requirement as a sex offender must be denied admission. (Exhibit 12). However, there is no such provision in the rules for termination. In fact, the only grounds for termination that could be based on criminal activity pre-dating admission, found

---

[13] It is helpful in this discussion to remember the distinction between terminating a tenancy and terminating benefits. In traditional public housing, the PHA is both the landlord and the agency that determines eligibility for the subsidy. In the Project Based Section 8 Program, although landlords are private parties, the subsidy is tied to a particular unit in a housing complex, and termination of tenancy is the same as termination of benefits. In the Section 8 Housing Voucher Program, PHAs determine whether grounds exist to terminate benefits, while the private Section 8 landlord makes determinations regarding eviction. The HUD pronouncements discussed below are directed to the "owners" of federally assisted housing whose decisions affect eligibility for benefits and do not apply directly to the Section 8 Housing Voucher Program, which is instead subject to the regulations at *24 C.F.R. Part 982*.

[14] Exhibits 12 and 13 are portions of the MSHA Section 8 administrative plan promulgated on May 17, 2005. This was the plan in place when Mr. Miller "ported" his voucher to Maine.

under the heading "mandatory termination", is if any member of a participant family was every convicted for the manufacture or production of methamphetamine on the premises of any federally assisted housing. (Exhibit 13). This of course is entirely consistent with, and is presumably based on, the relevant federal regulation. (Exhibit 35).

Using this legal framework, an analysis of Mr. Miller's situation shows that, consistent with the two administrative hearing decisions, Defendants did not have grounds for terminating his Section 8 benefits. (See Exhibits 23 & 25). He became a participant in the Section 8 program in Boston in 2002. (Exhibit 9 & Fact 16).[15] He remained in Massachusetts until 2005 when he ported his voucher to Maine. (Exhibits 11, 15, & 16). He remained a participant before, during, and after the porting process. 24 C.F.R. §982.355. Defendants correctly did not do an assessment as they would have for an applicant.[16] (See Exhibits 12). Since Mr. Miller is a participant in the program, his benefits can only be terminated for one of the reasons specified in the federal regulations at 24 C.F.R. §§982.552 and 982.553 or in the administrative plan. (Exhibits 13, 34, & 35). None of the reasons in either document are applicable, which is why the Defendants did not prevail at the administrative hearings and why the Plaintiff must prevail on his complaint. See Wojcik v. Lynn Hous. Auth., supra.

## V. Conclusion

Plaintiff has been denied his due process rights and his rights under federal law and regulations relating to the Section 8 Housing Voucher and Homeownership Program. He was lawfully admitted to the Section 8 program in 2002 and has remained a program participant ever

---

[15] Throughout this lengthy legal dispute, there have never been any allegations that Mr. Miller was not lawfully admitted as a Section applicant through the Boston Housing Authority under their administrative plan. (See Exhibit 25, page 6). Any allegation in this regard would of course have to go through the administrative process.

[16] "Therefore, when Mr. Miller moved to Maine and ported his Section 8 eligibility, PCAP (Penquis CAP) did not engage in any further eligibility determination, such as income and assets, criminal background, and the like. Had Mr. Miller been a new applicant, PCAP would have performed a full background check, including a criminal screening of all jurisdictions where he had resided." (Exhibit 23, page 1).

since. His participation can only be terminated for reasons specified in federal regulations or the PHA administrative plan. Defendants attempted twice, unsuccessfully, to terminate his participation through the administrative process mandated by federal law and the Fourteenth Amendment to the United States Constitution. Federal law provides that a PHA is not bound by a hearing decision that is contrary to law. Although Defendants have claimed this as their legal justification for refusing to implement the two administrative hearing decisions in Plaintiff's favor, they have not pointed to any specific law or regulation to which the decisions were contrary. Hence, by refusing to implement those decisions, Defendants have violated Plaintiff's rights under the laws and Constitution of the United States. If Defendants believe that there are other grounds for terminating Plaintiff's participation in the Section 8 program beyond those litigated in the administrative process, they must give Plaintiff notice and an opportunity to be heard rather than unilaterally end his subsidy, as to do so would also be a violation of his rights under the laws and Constitution of the United States. Finally, based on the criteria for terminating participation in the relevant federal regulations and Defendants' own administrative plan, thee are no grounds for terminating Plaintiff's participation due to his status as a sex offender registrant, even if he is appropriately classified as a lifetime registrant.

## VI.     Request for Relief

Plaintiff's requests are simple. He wants the Court to declare that his rights under the Fourteenth Amendment to the Constitution and under federal housing law were violated, to declare that he remains a participant in good standing in the Section 8 program, and to order Defendants to re-pay him the subsidy they should have paid from June 2007 through the present.

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIM

Plaintiff also moves for summary judgment on Defendants' Counterclaim, also based on the stipulated record submitted along with this motion.

Defendants counterclaimed under a theory of unjust enrichment, asserting that Mr. Miller should not have received any benefits in Maine under the Section 8 Voucher Program because of his status as a sex offender registrant and that it would be unjust for him to keep those benefits. The issues involving housing law and the Section 8 program were argued above and need not be repeated here. Since there was no basis for terminating Mr. Miller's participation when he moved to Maine, there is no legal basis for claiming unjust enrichment from his receipt of those benefits.

The elements of unjust enrichment are (1) a benefit is conferred; (2) the party who receives the benefit knows of or appreciates the benefit conferred; and (3) the party who receives the benefit accepts or retains the benefit under such circumstances as to make it inequitable for him/her to retain the benefit without payment of its value. Larson v. Johnson, 196 F. Supp. 2d 38, 41 (D. Me. 2002).

The only sections of the Section 8 regulations which provide for the recovery of benefits paid to a participant require a showing of fraud. *See* 24 C.F.R. §982.163 and 24 C.F.R. §792.101 et. seq. Defendants attempted to show this in the first administrative hearing process, but failed. (Exhibit 25).

> The definition of "fraud" is not provided in any of the relevant statutes or regulations regarding Section 8 rental subsidies. Nevertheless, Dowling, the Authority, and the Superior Court analyzed the definition of fraud in sections 982.551(k) and 982.552(c)(1)(iv) with reference to Maine's common law tort of fraudulent misrepresentation. Fraudulent misrepresentation occurs when someone:(1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance

upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to [her] damage. . . . Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to [her].

Dowling v. Bangor Hous. Auth., 2006 ME 136, P16 (Me. 2006), quoting Francis v. Stinson, 2000 ME 173, P38, 760 A.2d 209, 217.

There is no evidence that Mr. Miller ever made any false representations. The record shows that he properly completed the forms given to him by the Defendants. His general eligibility for the Section 8 program was not reviewed by Defendants when he ported to Maine, appropriately, and the questions on the "Eligibility Assessment" for participation in the Section 8 Homeownership Program would not have elicited any information about either his criminal past in the State of Washington or his sex offender registrant status. (Exhibit 18).

Hence, Plaintiff requests that Defendants' counterclaim be dismissed.

Dated: July 3, 2008                                     /s/     Judson-Esty-Kendall
                                                        Judson Esty-Kendall, Esq., Bar # 566
                                                        Pine Tree Legal Assistance, Inc.
                                                        61 Main St., Rm. 41
                                                        Bangor, ME  04401
                                                        (207) 942-8241
                                                        jesty-kendall@ptla.org
                                                        ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2008, I electronically filed this Plaintiff's Motion for Summary Judgment with the Clerk of Court using the CM/EFC system which will send notification of such filing to Defendants Dale McCormick, Maine State Housing Authority, and Penquis C.A.P. through their attorney, John S. Bobrowiecki, Jr., Esq., jbobrowiecki@mainehousing.org.

Dated: July 3, 2008                                     /s/     Judson Esty-Kendall
                                                        Judson Esty-Kendall, Esq., Bar Number 566

          Pine Tree Legal Assistance, Inc.
          61 Main Street
          Bangor, Maine 04401
          Telephone: (207) 942-8241
          ATTORNEY FOR PLAINTIFF