UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| RICHARD MILLER, )<br>)<br>   Plaintiff, )<br>)<br>v. )<br>)<br>DALE McCORMICK, MAINE STATE )<br>HOUSING AUTHORITY, and PENQUIS )<br>COMMUNITY ACTION PROGRAM, )<br>)<br>   Defendants. ) | Civ. No. 08-26-B-W |

**RECOMMENDED DECISION ON CROSS-MOTIONS**

For roughly 15 months, Plaintiff Richard Miller collected a housing voucher from Defendant Penquis Community Action Program under the auspices of Section 8 of the United States Housing Act of 1937, administered in Waldo County by Penquis on behalf of the Maine State Housing Authority.  In October 2006, Penquis discovered that Miller was subject to a requirement that he register as a sex offender due to a conviction in 1996 in the State of Washington on a charge of Child Molestation in the First Degree and that he had failed to register when he moved to Maine, in violation of Maine law.  Penquis notified Miller that it was terminating his voucher for program fraud, among other reasons, and the Housing Authority convened an informal hearing to comply with its due process obligations.  The state hearing officer decided, however, that Penquis failed to demonstrate facts sufficient to justify the termination.  Thereafter, Penquis raised alternative grounds to terminate Miller's voucher, including the contention that Miller was subject to a lifetime registration requirement and must be removed from the program.  Following another hearing, the hearing officer again decided that the Housing Authority failed to establish a sufficient factual basis to justify termination.

Following the second adverse decision, the Housing Authority notified Miller that it was terminating his voucher regardless of the hearing officer's decisions and, in fact, terminated the voucher. Miller brought the instant civil rights action, claiming that the Housing Authority and its agent, Penquis, deprived him of property without due process of law and that the termination of his benefits violated Miller's rights under the Section 8 voucher program. The defendants responded with a claim for unjust enrichment, hoping to recoup the funds they had provided to Miller under the program. Now pending are cross-motions for dispositive rulings based on a stipulated record, which have been referred for report and recommended decision.

## Facts

Defendant Maine State Housing Authority is a public body corporate and politic and an instrumentality of the State, established under 30-A M.R.S. §§ 4722 *et. seq.*, which promotes housing opportunities for low income people including the Section 8 Housing Choice Voucher Program and the related Section 8 Housing Choice Voucher Homeownership Program. Defendant Dale McCormick is the Director of the Housing Authority and its chief executive officer with ultimate managerial responsibility for its actions. Defendant Penquis Community Action Program is a non-profit corporation in the State of Maine and an agent of the Housing Authority that administers the Section 8 Housing Voucher Program on behalf of the Housing Authority in Penobscot and Waldo counties. (Stip. R. ¶¶ 2-4, Doc. No. 23.) I will refer to the defendants collectively as "the Housing Authority" or "the Authority."

The Section 8 Housing Choice Voucher Program, enacted as Section 8 of the United States Housing Act of 1937, is codified at 42 U.S.C. § 1437f. The United States Department of Housing and Urban Development (HUD) has promulgated regulations implementing this program at 24 C.F.R. Part 982. The Section 8 Housing Voucher Program is generally designed

to help low-income individuals and families by providing rent subsidies that enable them to rent existing units in the private rental housing market. The program includes a Section 8 Homeownership Option at 42 U.S.C. § 1437f(o)(15). The homeownership option helps low-income individuals and families become homeowners by providing mortgage subsidies that enable them to purchase a home. (Stip. R. ¶¶ 5-8.)

In 1996, the Superior Court of Washington convicted Miller of Child Molestation in the First Degree and required, as a component of his sentence, that he register as a sex offender indefinitely, until relieved of that obligation by a court of competent jurisdiction. (Stip. R. ¶¶ 13-14; Certified Copy of Judgment and Sentence, Stip. Ex. 2.) Mr. Miller subsequently moved to Massachusetts in 2001 and, in violation of the requirements of his sentence, did not notify the relevant authorities in Washington of his new address. A Massachusetts public housing authority later admitted him to Section 8 housing.[1] (Stip. R. ¶ 16.)

In July of 2005, Miller moved to Maine and, in violation of Washington law and Maine law, failed to register as a sex offender. In connection with his move, Miller "ported" his Section 8 voucher to Maine and obtained subsidized housing with assistance from Defendant Penquis Community Action Program. Penquis, relying on Miller's prior admission to the program in Massachusetts, did not run a background check on Miller to determine if he was required to list himself on a sex offender registry. In 2006, Miller applied for, and was granted, admission to a Section 8 homeownership program, through which Penquis agreed to subsidize his mortgage payments on the purchase of a new residence. (Stip. R. ¶¶ 15, 17-18.) That transaction required Miller to execute form HUD-52649, prepared by the U.S. Department of Housing and Urban

---

[1] Miller did not notify his local Massachusetts PHA of his conviction in Washington or of his registration requirement. (Jan. 30, 2007, Admin. Hr'g Dec. at 3, Stip. Ex. 23.)

Development ("HUD"), which provided that his public housing authority "may deny or terminate homeownership assistance" for a number of reasons, including the fact that "[a]ny household member is subject to a lifetime registration requirement under a [s]tate sex offender registration program."  (Stip. Ex. 20, § 2.E.)

The day prior to his closing on the purchase, on October 24, 2006, a Thomaston police officer, acting on a tip, interviewed Miller and arrested him for failure to register as a sex offender.  (Thomaston Police Dep't Incident Report, Stip. Ex. 6.)  Miller went forward with the closing the next day and Penquis did not learn of Miller's registration requirement until sometime between the October closing and December.  In December 2006, Penquis chose to terminate Miller's benefits and notified him that it was doing so because he committed fraud or another corrupt act by failing to disclose his registration requirement and/or because he engaged in criminal activity threatening the health or safety of others by failing to register.  (Stip. R. ¶¶ 20-22.)

A due process hearing ensued.  The presiding state administrative hearing officer set aside the decision to terminate Miller's benefits.  (Id. ¶ 23.)  She concluded that there was not sufficient evidence of fraud because Miller had not made an affirmative false representation and because he was never "made aware of any obligation to disclose that status."  (Jan. 30, 2007, Admin. Hr'g Dec. at 6, Stip. Ex. 23.)  She also decided that Miller's criminal act of failing to register was not threatening to the public's health or safety because there was no evidence offered concerning anyone living in the vicinity of Miller's new residence.  (Id. at 4.)

Penquis returned to the drawing board and, in February, gave Miller another termination notice, this time contending that Miller had committed "violent criminal activity," in violation of the applicable housing regulations, consisting of the facts underlying Miller's 1996 conviction for

4

child molestation in the first degree.  (Stip. R. ¶ 24.)  Another hearing ensued and the same hearing officer presided.  She again denied the termination of benefits, concluding that the regulation in question concerned only criminal activity that transpired while the participant was receiving housing benefits, not past criminal history that predated Miller's admission to a Section 8 housing program.  (May 29, 2007, Admin. Hr'g Dec. at 8, Stip. Ex. 25.)  In the course of rendering that decision, the hearing officer considered whether Miller was, in fact, subject to a lifetime registration requirement, because the Authority argued that he was and that his status as a lifetime registrant mandated his expulsion from the program.  She concluded that the record before her did not establish, by a preponderance of the evidence, that Miller was subject to a lifetime registration requirement because a Washington court could relieve him of the obligation to register and the Housing Authority had not demonstrated facts likely to preclude future relief from the registration requirement.  (Id. at 4-6.)  As part of this finding, the hearing officer reasoned that "it must be presumed that the [Massachusetts housing authority] followed the requirements set forth in the federal regulations when processing [Miller's] application";  that "[i]t follows, therefore, that the [authority] did not determine the participant to be subject to lifetime registration";  and that, "[t]herefore, MSHA's argument in this regard must fail."  (Id. at 6.)

On June 6, 2007, the counsel for the Housing Authority notified Mr. Miller that it did not intend to be bound by the hearing officer's decisions because they were contrary to HUD regulations and requirements or otherwise contrary to federal and state law, although no specific grounds were cited.  (Stip. R. ¶ 26;  Stip. Ex. 26.)  The Housing Authority ceased making payments on Mr. Miller's Section 8 Home Ownership Option subsidy and has not made any payments since May 2007.  From August 2005 through May 2007, Mr. Miller received benefits

5

under the Section 8 voucher and homeownership programs in the total amount of $8,104.00. (Stip. ¶¶ 26-28.)

In June of 2008, the Maine Bureau of Identification concluded that Miller is subject to a lifetime registration requirement in Maine. (Stip. Ex. 8.)

## Discussion

Mr. Miller contends in this civil action that the Authority defendants must be ordered to abide by the hearing officer's decisions and that the decision to terminate his benefits in the face of the hearing officer's decisions violated the federal regulatory regime (count I) and violated his constitutional right to procedural due process (count II). Both of these claims are advanced under the Civil Rights Act of 1871, 42 U.S.C. § 1983. For relief, Miller asks the Court to declare that the defendants' conduct violated his rights, order the defendants to reinstate his benefits and enjoin the defendants from terminating them again, and order the defendants to reimburse him for the value of the mortgage subsidy he lost during the pendency of this action. (Request for Relief, Compl. at 7, Doc. No. 1.) For their part, the Authority defendants request that the Court enter judgment against Miller's claims and also request judgment in their favor on a counterclaim for unjust enrichment in the value of $8,104.00. (Ans. and Counterclaim, Doc. No. 10.)

*1. The informal hearing process*

The procedural scheme that resulted in the hearing officer's decision is prescribed by HUD regulation. That regulation requires that a PHA afford a participant in a housing program with an "informal hearing to consider whether [certain] decisions relating to the individual circumstances of a participant family are in accordance with the law, HUD regulations and PHA policies." 24 C.F.R. § 982.555(a)(1). Among the decisions subject to the requirement is a decision "to terminate assistance for a participant family because of the family's action or failure

to act (see § 982.552)." Id. § 982.555(a)(1)(v) & (a)(2). The informal hearing process requires notice to the participant with a brief statement of the reason for the decision and a statement informing the participant of the right to request an informal hearing. Id. § 982.555(c)(2). Hearing procedures are to be in accordance with the PHA's administrative plan. Id. §982.555(e)(1). The PHA has the authority to appoint the hearing officer, provided that the officer is not someone who made or approved the decision under review or a subordinate of such person. Id. § 982.555(e)(4). With respect to the hearing officer's decision, the regulation provides that "[f]actual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing." Id. § 982.555(e)(6). The regulation provides that the PHA is not bound by the hearing officer's decision (1) when the decision "exceeds the authority of the person conducting the hearing under the PHA hearing procedures"; and/or (2) is "[c]ontrary to HUD regulations or requirements, or otherwise contrary to federal, State, or local law." Id. § 982.555(f)(1) & (2). Should the PHA determine that the hearing officer's decision is not binding, it "must promptly notify the family of the determination, and of the reasons for the determination." Id. § 982.555(f)(3).

   2. *A lifetime registration requirement is a legitimate basis for terminating Section 8 benefits.*

HUD regulations set out the circumstances under which benefits may be denied or terminated. Among other requirements, HUD requires that all PHAs "must establish standards that prohibit admission to the program if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program." 24 C.F.R. § 982.553(a)(2). Additionally, HUD requires all PHAs to "establish standards that allow the PHA to terminate assistance for a family under the program if the PHA determines" that certain

criminal activity has transpired. Id. § 982.553(b)(1)(i). Non-violent and non-drug crimes are not listed among the crimes for which the PHA must establish standards for termination. Id. § 982.553(b)(1)-(3). However, the regulation also states: "The PHA may terminate assistance for criminal activity by a household member as authorized in this section if the PHA determines, based on a preponderance of the evidence, that the household member has engaged in the activity . . . ." Id. § 982.553(c). This subsection of the regulation (subsection (c)) permits termination of assistance for the criminal activity referred to elsewhere in the entirety of section 982.553, without limitation. Subsection (a)(2) refers to criminal activity resulting in a lifetime registration requirement, for which exclusion[2] from the program is mandated. Id. § 982.553(a)(2). Such criminal activity informs the interpretation of subsection (c), so that a PHA "may terminate assistance" based on a finding that the participant engaged in the activity that resulted in a lifetime registration requirement. Id. § 982.553(c). Additionally, an official criminal record of the identified criminal activity is a sufficient evidentiary basis to support a decision to deny admission or to terminate assistance, provided that the participant is given "an opportunity to dispute the accuracy and relevance of that record" at an informal hearing. Id. § 982.553(d)(2).

It does not appear from this record that the hearing officer acted erroneously in proceeding on the assumption that the evidentiary burdens rested with the Authority. However, the Authority presented the hearing officer with a certified criminal record demonstrating that

---

[2] Miller contends that the regulations establish rigid tracks for "admission" decisions and for "termination" decisions, so that whatever the regulations say about criminal activity in a section addressed to the denial of admission can have no bearing whatsoever on anything that is said in a section addressed to a termination decision. (Pl.'s Mot. at 12-16.) I read § 982.553(c) to blur those lines. See also 24 C.F.R. § 982.522(c)(xi) (authorizing the PHA to terminate assistance at any time if "the family has engaged in criminal activity . . . as described in § 982.553," not merely as described in § 983.553(b)). At best, there is ambiguity here. I construe the regulations to mean that a lifetime registrant must be denied admission and that, if he is erroneously admitted into a Section 8 voucher program (whether due to oversight and neglect on the part of the PHA or due to unlawful failure to register on the part of the participant), the PHA may terminate his assistance. I regard this as an ordinary, common-sense reading of the regulation. For what it is worth, I also observe that such a construction is consistent with the form HUD-52649, which also has a bearing on this case.

Miller is subject to an indefinite requirement to register as a sex offender. That certified record is a sufficient basis to justify the termination of benefits under 24 C.F.R. § 982.553(c), provided that the conviction and registration requirement imposed in the State of Washington subject Miller to a lifetime registration requirement under a state sex offender program. If they do, then the burden should have shifted to Miller to dispute the accuracy and relevance of his criminal record. Id. § 982.553(d)(2); cf. Basco v. Machin, 514 F.3d 1177, 1181-82 (11th Cir. 2008) (placing initial burden on authority to show that an unauthorized individual has been staying in the residence for a proscribed period of time, but then shifting the burden to the participant to show that the individual is a visitor rather than an unauthorized resident).

> 3. *Miller is subject to a lifetime registration requirement under the Maine sex offender registration program.*

In this case, the hearing officer discredited the Housing Authority's contention that Miller was subject to a lifetime registration requirement based, in part, on a very questionable presumption. Specifically, she concluded as a factual matter that the Washington court's registration requirement could not be a lifetime registration requirement based on the absence of evidence related to what the Massachusetts Authority did or did not do when processing Miller's application for Section 8 benefits. That presumption, in my view, is untenable. There simply is no discernable reason why the Massachusetts Authority's action or inaction should have any weight in regard to the legal question of whether the Washington registration requirement amounts to a lifetime registration requirement in Washington or in Maine. Setting aside this presumption, the hearing officer basically reasoned that the registration requirement might not be for life because the Authority had not demonstrated facts that would likely preclude Miller from

being relieved of the requirement during his lifetime.[3] In my view, the hearing officer's finding on this question was erroneous because the judgment imposing the registration requirement is a sufficient factual predicate to require a contrary finding as a matter of Maine law.[4]

Pursuant to Maine's Sex Offender Registration and Notification Act of 1999, there are two sex offender registration categories. One is either a 10-year registrant or a lifetime registrant. 34-A M.R.S. § 11222. When a person is sentenced in another jurisdiction and moves into Maine, that person has a duty to notify law enforcement within 24 hours of establishing a residence in Maine and must thereafter register with the State Bureau of Identification within 5 days. Id. § 11223. Said person "shall register as a 10-year registrant or lifetime registrant, whichever is applicable." Id. Which category applies depends on whether the registrant is subject to a registration period that is stated as "a period of years rather than for a lifetime." Id. § 11225-A(2), (4). If a period of years was imposed in the other jurisdiction, the registrant must register in Maine for a period of 10 years, with credit available for past registration in another jurisdiction. Id. § 11225-A(2)(A). If a lifetime requirement was imposed, then the registrant must register in Maine "for the duration of that person's life." Id. § 11225-A(4)(A). Here, Miller is subject to an indefinite registration requirement, but may petition a competent court for relief after 10 years of compliance.

---

[3] The hearing officer did not consider how a competent court having jurisdiction to amend Miller's registration requirement might regard Miller's failure to comply over a period of roughly five years. Nor did she address how the Washington court's order that Miller maintain his sex offender registration related to her finding that Miller had never been made aware of any obligation to disclose his sex offender status. In Maine, for example, there is an affirmative duty to register. 34-A M.R.S. § 11222(2), (2-A), (2-B), (2-C).

[4] Miller asserts in his motion that the Housing Authority has "never asserted . . . that the status of lifetime registrant was grounds for termination." (Pl.'s Mot. at 9, Doc. No. 22, citing Stip. Ex. 22 & 24.) Although the termination letters do not state this ground, it was among the legal issues addressed by the hearing officer and by the parties during at least the second administrative hearing. (See May 29, 2007, Admin. Hr'g Dec. at 4-5.) Certainly the parties all appreciate that Miller's prior conviction and his registration status are precisely what give rise to the controversy between the parties.

Although § 11225-A does not neatly resolve the question of how long Miller should be required to register in Maine, clearer guidance is afforded by § 11203 of the Sex Offender Registration and Notification Act. In Maine, "lifetime registrant" status is defined to apply to adults, or juveniles sentenced as adults, who are convicted of a sexually violent offense or who are repeat offenders. Id. § 11203(8). A "sexually violent offense" means a conviction or attempt to commit offenses proscribed in various sections of Maine's criminal code, including 17-A M.R.S. § 255-A(1)(E-1) (unlawful sexual contact and the other person is less than 12 years of age and the actor is at least 3 years older). See 34-A M.R.S. § 11203(7)(A).

The Judgment and Sentence of the Superior Court of Washington is dated September 26, 1996. (Stip. Ex. 2.) It records a conviction for "Child Molestation in the First Degree" and identifies the victim's date of birth as September 7, 1986. (Id.) The victim was 10 years old as of the date of the court's judgment. Child Molestation in the First Degree consists of "sexual contact" with a child under twelve years of age. Rev. Code Wash. § 9A.44.083. (See also Stip. Ex. 3.) Per Washington law "sexual contact" amounts to "touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." Rev. Code Wash. § 9A.44.010. Per Maine law, "sexual contact" consists of "touching of the genitals or anus, directly or through clothing . . . for the purpose of arousing or gratifying sexual desire or for the purpose of causing bodily injury or offensive physical contact." 17-A M.R.S. § 251(1)(D). Miller's conviction for Child Molestation in the First Degree reflects conduct falling within the sexual contact requirement of Maine's Unlawful Sexual Contact statute, and the age of the victim also corresponds with the age provisions of subsection E-1 of Maine's unlawful sexual contact statute, which means that the Maine law definition of a lifetime registrant applies to Miller. Additional support for this conclusion is

found in § 11225-A(4)(B) of the Act.  If Miller had been convicted of "a crime that includes the essential elements of a sexually violent offense" under the Maine Act, and the state of conviction had not imposed a sex offender registration requirement on him, he would nevertheless be mandated to register for life in Maine.  See 34-A M.R.S. § 11225-A(4)(B).  Given this legislative scheme, the conclusion drawn by the Bureau of Identification that Miller is subject to a lifetime registration requirement in Maine is entitled to significant deference.

If there is to be any evidentiary presumption on this record, it would be that the Authority established a prima facie case that Miller is subject to a lifetime registration requirement in the State of Maine.  It was an error of law for the hearing officer to reject the Authority's core contention that Miller is subject to a lifetime registration requirement in the State of Maine and to treat the certified copy of the judgment and conviction as insufficient to meet the Authority's burden on that issue.  If there was any evidentiary shortcoming on this record, it was due to Miller's failure to present evidence challenging this prima facie showing.

> 4. *The Housing Authority was acting within its discretionary authority when it terminated Miller's benefits.*

The Housing Authority has the discretionary authority to terminate the benefits of a participant who is subject to a lifetime registration requirement, pursuant to both 24 C.F.R. § 982.553(c) (providing that a PHA "may terminate assistance" for such criminal activity), and pursuant to subsection 2.E of the form HUD-52649, which Miller executed in connection with his application for the homeownership voucher (Stip. Ex. 20), unless Miller can dispute the accuracy and relevance of his criminal record, 24 C.F.R. § 982.553(d)(2).  In this case, Miller's criminal record is introduced as a stipulated exhibit, so accuracy is not disputed.  As for its relevance, Miller has argued only that Maine's 10-year registration requirement should be

12

regarded as a default category for registrants like Miller who are subject to an indefinite registration obligation. (Pl.'s Response to Defs.' Mot. at 6-7, Doc. No. 24.) I have rejected that legal argument for reasons already given. Miller's registration requirement is indefinite and the underlying judgment and conviction is sufficient evidence of a sexually violent offense for purposes of Maine's Sex Offender Registration and Notification Act, which means that Miller is properly classified as a lifetime registrant in Maine.

    *5. Miller's civil rights claims necessarily fail.*

Miller advances both of his federal claims under 42 U.S.C. § 1983. That statute provides for a civil action against state actors who have subjected the claimant "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In his first count Miller contends that the Authority's determination to disregard the hearing officer's decision violated his federal rights under the Section 8 program. I have concluded that the stipulated record does not support this contention. The hearing officer's decision was appropriately disregarded in this case because it was "contrary to HUD regulations or requirements, or otherwise contrary to federal, State, or local law." 24 C.F.R. §§ 982.555(f)(2). In his second count Miller contends that the Authority's determination to terminate his benefits despite the hearing officer's decision violated his due process rights. However, the fact that the hearing officer's decision was contrary to HUD regulations and state law undermines this claim as well because Miller has advanced no other transgression with respect to his due process rights. None of the stipulated facts suggest that the Authority deprived him of any of the five pre-deprivation due process requirements applicable to the termination of housing benefits. See Goldberg v. Kelly, 397 U.S. 254, 266-71 (1970); Clark v. Alexander, 85 F.3d 146, 150 (4th Cir. 1996) ("Goldberg places five requirements on the termination process employed by a housing

authority: (1) timely notice . . . , (2) an opportunity by the tenant to confront and cross-examine each witness . . . , (3) the right . . . to be represented by counsel, (4) a decision, based solely on evidence adduced at the hearing, in which the reasons for the decision are set forth, and (5) an impartial decision maker.")  I therefore recommend that the Court grant the Authority defendants summary judgment on both counts of Miller's civil rights action.

> 6. *The Court should decline to exercise supplemental jurisdiction over the state law counterclaim for unjust enrichment and dismiss it without prejudice.*

With a solitary counterclaim for unjust enrichment, the Authority seeks to recoup $8,104.00 in Section 8 benefits Miller received through Defendant Penquis.  Pointedly, this claim is styled exclusively as a state common law claim.  The Authority does not refer to any federal law or regulation that would serve to invoke this Court's federal question jurisdiction and, in its papers, effectively concedes that there is no federal claim worth pursuing against Miller.[5] (Defs.' Response at 5, Doc. No. 25.)  Assuming that the Court could exercise supplemental jurisdiction over this state law counterclaim, see Iglesias v. Mut. Life Ins. Co., 156 F.3d 237, 241 (1st Cir. 1998) (holding that supplemental jurisdiction over counterclaims is more properly limited to compulsory counterclaims under § 1367),[6] the decision whether to exercise that power is a matter of discretion.  It is not the counterclaimant's right to join every counterclaim over

---

[5] The fact that Miller might assert an affirmative defense related to the federal regulations that allow recoupment only in cases of proven fraud does not necessarily convert the action into a federal claim under the "well pleaded complaint" rule.  See Merrell Dow Pharm., Inc. v. Thompson, 478 U.S. 804, 808-809 (1986).

[6] A compulsory counterclaim is one that meets one of the following four tests: (1) the issues of fact and law raised in the counterclaim are "largely the same" as those raised in the claim;  (2) *res judicata* would bar a subsequent suit on defendant's counterclaim absent the compulsory counterclaim rule;  (3) substantially the same evidence will support or refute both the plaintiff's claim and the defendant's counterclaim; or (4) there is a "logical relation" between the claim and the counterclaim.  Iglesias, 156 F.3d at 241.  As for a logical relation, it is said to exist when the counterclaim arises out of the same aggregate of operative facts as the original claim in two senses:  (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.  Id. at 242 (quoting Revere Copper & Brass, Inc. v. Aetna Cas. & Sur. Co., 426 F.2d 709, 715 (5th Cir. 1970)).

which the federal court lacks original jurisdiction.  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  Instead, the "justification" for exercising supplemental jurisdiction "lies in considerations of judicial economy [and] convenience and fairness to litigants;  if these are not present a federal court should hesitate to exercise jurisdiction over state claims."  Id.  In the language of § 1367:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
> . . .
> > (3) the district court has dismissed all claims over which it has original jurisdiction . . . .

28 U.S.C. § 1367(c).  Should the Court adopt my recommendation that it grant summary judgment to the Authority defendants on all claims asserted in Miller's complaint, then I recommend that it also decline to exercise supplemental jurisdiction over the defendants' counterclaim for unjust enrichment and dismiss it without prejudice.  If adopted, this approach will effectively moot Miller's motion to dismiss the defendants' counterclaim (Doc. No. 13), which motion I reserved ruling on following a conference with counsel because the arguments Miller presented for dismissal of the counterclaim were thoroughly tied up in the merits of Miller's own claims.  (Doc. No. 18.)

## Conclusion

The stipulated record presented by the parties demonstrates that Miller received the minimal process that he was due, including notice, a hearing, and an impartial decision maker.  It also includes a certified criminal record and a stipulated finding by the Bureau of Identification that generate a prima facie case, as a matter of law, that Miller is subject to a lifetime registration requirement in the State of Maine.  Miller's factual presentation does nothing to generate a genuine issue of material fact whether that prima facie finding should be called into question

based on the particular facts underlying Miller's conviction or based on his subsequent conduct, particularly as the record evinces a roughly five-year violation of Miller's duty to register as a sex offender.  Because Miller qualifies as a lifetime registrant under Maine law, the Authority possessed the discretionary authority to terminate his benefits.  Because the hearing officer's contrary determination was contrary to state law and federal regulations, the Authority also acted within its discretion when it determined that it would not be bound by the hearing officer's decision.

I RECOMMEND that the Court DENY Plaintiff's Motion for Summary Judgment (Doc. No. 22) and GRANT Defendants' Motion for Judgment on a Stipulated Record (Doc. No. 21), IN PART, by entering judgment for the defendants on both counts of Miller's complaint.  I further recommend that the defendants' request for judgment on their counterclaim be denied and that the counterclaim be dismissed without prejudice.  The dismissal of the counterclaim on jurisdictional grounds effectively moots Miller's reserved motion to dismiss it on the merits (Doc. No. 13).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 22, 2008