UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-08-26-B-W |
| | ) | |
| DALE MCCORMICK, MAINE STATE | ) | |
| HOUSING AUTHORITY, and | ) | |
| PENQUIS COMMUNITY ACTION | ) | |
| PROGRAM, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Congress has acted to prevent the admission of illegal drug users, alcohol abusers, and lifetime sex offender registrants into federally assisted housing programs.  Pursuant to that statutory authority, the United States Department of Housing and Urban Development (HUD) promulgated regulations that ban all three groups—drug users, alcohol abusers, and lifetime sex offender registrants—from admission into the programs.  However, the regulations do not treat equally members of these groups who avoid the ban and become program participants.  The regulations expressly provide for the termination of benefits to program participants because they are illegal drug users or alcohol abusers; the regulations do not expressly provide for termination of benefits to program participants because they are lifetime sex offender registrants.  The Court, therefore, rejects the Magistrate Judge's Recommended Decision, which concluded that 24 C.F.R. § 982.553(c) authorizes a termination of benefits to a program participant because he is a lifetime sex offender registrant.

## I.     STATEMENT OF FACTS

Richard Miller, a convicted sex offender and beneficiary of a Section 8 home ownership voucher, claims that the Maine State Housing Authority (MSHA) unlawfully terminated his subsidy in violation of the Fourteenth Amendment to the United States Constitution and federal law.  Seeking damages, injunctive, and declaratory relief, he initiated this action pursuant to 42 U.S.C. § 1983 against the MSHA; its Director, Dale McCormick; and Penquis Community Action Program (Penquis), a non-profit corporation that administers on behalf of the MSHA the federal Section 8 housing voucher program in Penobscot and Waldo counties.  Defendants counterclaimed in unjust enrichment to recoup benefits conferred on and allegedly wrongfully retained by Mr. Miller.

Mr. Miller moved to dismiss Defendants' Counterclaim and the parties filed cross-motions for judgment on a stipulated record.  *Mot. to Dismiss Countercl. for Failure to State a Claim upon which Relief Can Be Granted* (Docket # 13) (*Pl.'s Mot. to Dismiss Countercl.*); *Defs.' Mot. for J. on a Stipulated R.* (Docket # 21) (*Defs.' Mot. for J.*); *Pl.'s Mot. for Summ. J. on His Compl.* (Docket # 22) (*Pl.'s Mot. for Summ. J.*); *Stip. R.* (Docket # 23).  The Court referred these motions to the United States Magistrate Judge, who recommended that the Court grant judgment in Defendants' favor and decline to exercise supplemental jurisdiction over Defendants' Counterclaim pursuant to 28 U.S.C. § 1367.  *Recommended Decision on Cross-Mots.* at 15-16 (Docket # 26) (*Rec. Dec.*).   Mr. Miller objected to the Magistrate Judge's recommendation and Defendants responded.  *Pl.'s Objection to the Recommended Decision of the Magistrate* (Docket # 27) (*Pl.'s Obj.*); *Defs.' Resp. to Pl.'s Objection to the Recommended Decision of the Magistrate* (Docket # 28) (*Defs.' Resp. to Pl.'s Obj.*).  At the parties' request, the Court held oral argument on March 18, 2009.

A.      **The Stipulated Record**

On August 15, 1996 in Snohomish County, Washington, Mr. Miller pleaded guilty to one count of child molestation in the first degree.[1]  *Stip. R.* ¶ 13; *Stip. Ex.* 1.  He was convicted and sentenced to fifty-five months imprisonment on September 23, 1996.  *Stip. Ex.* 2.  As a result of this 1996 conviction, Mr. Miller is required to register as a sex offender in Washington until he petitions and is relieved by a competent court.  *Stip. R.* ¶ 14.  Mr. Miller moved to the commonwealth of Massachusetts and applied for and was accepted into a Section 8 Housing Voucher Program there on October 1, 2002.  *Stip. R.* ¶ 16.  When Mr. Miller moved to Knox County, Maine in July 2005, he was required to register as a sex offender in Maine.  *Stip. R.* ¶ 15.  Mr. Miller did not register in Maine, and, acting on a call from his then-landlord, Thomaston police arrested him on October 24, 2006.[2]  *Stip. R.* ¶ 21; *see* 34-A M.R.S.A. § 11227(1).  He registered "immediately" after his arrest, and ever since appears to have complied with his registration obligations.  *Stip. R.* ¶ 21; *see Stip. Ex.* 7.

When Mr. Miller moved to Maine from Massachusetts in 2005, he "ported," or transferred, his Section 8 housing voucher for which he had qualified since October 1, 2002.  *Stip. R.* ¶¶ 16-17.  At some point before his arrest, Mr. Miller moved into Penquis's coverage area, and Penquis "absorbed" him; Penquis has administered his voucher since January 1, 2006.  *Id.*; *Stip. Exs.* 15, 16.  In the summer of 2006, Penquis qualified Mr. Miller for the Section 8

---

[1] State of Washington law provides:
> (1)  A person is guilty of child molestation in the first degree when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim.
>
> (2)  Child molestation in the first degree is a class A felony.

Wash. Rev. Code § 9A.44.083; *Stip. Ex.* 3.  Mr. Miller admitted each element of the offense, and specifically admitted having sexual contact with another who was less than twelve years old, and who was at least thirty-six months younger than he.  *Stip. Ex.* 1 at 4.

[2] The arrest report states that a warrant for Mr. Miller's arrest was pending in Washington State for failing to register as a sex offender there.  According to the report, an officer with the Snohomish County Sheriff's Office explained that Mr. Miller "had failed to register since 2001 and had not been heard from."  *Stip. Ex.* 6 at 2.

homeownership option. *Stip. R.* ¶ 19. With other assistance, Mr. Miller purchased from Penquis a newly constructed home in Searsport on October 25, 2006—the day after Thomaston police arrested him for failing to register as a sex offender. *Stip. R.* ¶¶ 19-20; *Stip. Ex.* 19.

A month and a half later, on December 14, 2006, Penquis notified Mr. Miller of its decision to terminate his participation in the Section 8 homeownership program in accordance with 24 C.F.R. § 982.552, which is a HUD regulation addressing the denial or termination of assistance for families. *Stip. R.* ¶ 22; *Stip. Ex.* 22. Penquis proffered two reasons: (1) Mr. Miller "committed fraud or other corrupt criminal act" by violating "the Statement of Homeownership Voucher Program, form HUD-52649 in that [he] failed to disclose" that he was required to register as a sex offender under state law; and, (2) Mr. Miller violated his "obligation not to engage in other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises" by failing to register as required by law. *Stip. Ex.* 22.

An MSHA Administrative Hearing Officer reviewed and set aside this decision on January 30, 2007. *Stip. R.* ¶ 23; *Stip. Ex.* 23. The Hearing Officer framed the issue:

> Whether the participant's assistance under the Section 8 Housing Choice Voucher Homeownership Program should be terminated for fraud or other corrupt or criminal act in connection with a Federal housing program under 24 C.F.R. Section 982.552(c)(1)(iv), or because he has violated the family's obligation not to engage in other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents or persons residing in the immediate vicinity under 24 C.F.R. Section 982.552(c)(1)(i).

*Stip. Ex.* 23 at 3. Addressing "fraud or other criminal act," the Hearing Officer noted that the MSHA's Administrative Plan for Section 8 Housing Choice Voucher and Moderate Rehab Programs (the MSHA Plan) allows for termination of a participant for program fraud. *Id.* at 5; *see Stip. Ex.* 13 at 21. However, the Hearing Officer concluded that Mr. Miller did not commit

program fraud by failing to disclose that he was required to register as a sex offender under Maine law.  Relying on *Dowling v. Bangor Housing Authority*, 2006 ME 136, 910 A.2d 376, in which the Supreme Judicial Court interpreted "fraud" in HUD regulations according to the familiar common law standard, the Hearing Officer determined that Mr. Miller did not commit fraud because he neither made a false statement of fact regarding his status as a registrant nor was under any obligation to disclose his registrant status.  *Stip. Ex.* 23 at 5-6.

Turning to "criminal activity," the Hearing Officer observed that the MSHA Plan permits termination of a subsidy to a participant if "'[a]ny household member engages in any . . . criminal activity that threatens the health[,] safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.'"  *Id.* at 4 (quoting the MSHA Plan); *Stip. Ex.* 13 at 20.  Although the Hearing Officer was satisfied that Mr. Miller's failure to register pursuant to Maine law constituted criminal activity, she concluded that the record was inadequate to determine that Mr. Miller's conduct was sufficiently threatening to justify termination on this basis.  *Stip. Ex.* 23 at 4; *see* 24 C.F.R. § 982.555(e)(6) ("Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing.").  Rejecting both reasons for termination, the Hearing Officer set Penquis's decision aside.[3]

On February 9, 2007, Penquis again notified Mr. Miller of its decision to terminate his participation in the program, this time in accordance with 24 C.F.R. §§ 982.551-.553.[4]  Penquis

---

[3] Neither in their motion for judgment nor in their response to Mr. Miller's objection to the Magistrate Judge's recommendation do Defendants contend that either conclusion is contrary to HUD regulations or otherwise contrary to law.  *See Defs.' Mot. for J.*; *Defs.' Resp. to Pl.'s Obj.*  Defendants clarified at oral argument that they have no evidence as to what Mr. Miller or the Massachusetts Public Housing Authority did when he was admitted to the program there.  Accordingly, Defendants do not argue that his admission to the program was fraudulent or otherwise unlawful.

[4] These sections are a collection of HUD regulations addressing denial or termination of assistance for families generally, and specifically a participant's obligations under the program, any violation of which is grounds for

explained that it was terminating Mr. Miller for a third reason—he "committed violent criminal activity, to wit:  Child molestation in the first degree between the dates of July 1, 1995 and March 26, 1996."  *Stip. Ex.* 24.  The same MSHA Hearing Officer reviewed and set aside this decision on May 29, 2007.  *Stip. R.* ¶ 25; *Stip. Ex.* 25.  In the Hearing Officer's view, the issue was "[w]hether MSHA may terminate the participant's assistance under the Section 8 Housing Choice Voucher Homeownership Program for commission of violent criminal activity."  *Stip. Ex.* 25 at 3.

Before reaching that issue, however, the Hearing Officer, conscious of statutory and regulatory mandates to deny admission to sex offenders subject to lifetime registration requirements, considered whether Mr. Miller is such a registrant.  She determined that the evidence was insufficient to support a conclusion that he is required to register for life, and that his mere status as a registrant did not justify termination of his Section 8 assistance.  *Id.* at 4-6.  The Hearing Officer similarly disagreed with the MSHA that it could terminate Mr. Miller's assistance because of his underlying offense, which occurred ten years before the termination decision.  *Id.* at 8.  Finally, the Hearing Officer determined that the MSHA failed to establish that Mr. Miller's underlying offense necessarily included conduct that constitutes "violent criminal activity" as the MSHA Plan defines that phrase.  *Id.* at 8-9.

Despite the Hearing Officer's decisions, the MSHA advised Mr. Miller on June 6, 2007 that his "voucher has been terminated pursuant to the previously provided termination letters."  *Stip. Ex.* 26.  According to the final termination notice, the MSHA "determined that it will not be bound by the decisions of January 30, 2007 and May 29, 2007 as they are contrary to HUD

---

termination (§ 982.551), and denial of admission and termination of assistance for criminals and alcohol abusers (§ 982.553).  *Stip. R.* ¶ 24; *Stip. Ex.* 24.

regulations or requirements or otherwise contrary to federal and state law." *Id.* The MSHA has not made any payments on Mr. Miller's Section 8 voucher since May 2007. *Stip. R.* ¶ 27.

### B.   Mr. Miller's Complaint

On January 28, 2008, Mr. Miller filed suit against Dale McCormick, Director and Chief Executive Officer of the MSHA, against the MSHA itself, and against Penquis. *Compl.* (Docket # 1). Bottomed on asserted violations of 42 U.S.C. § 1983, Mr. Miller's Complaint contains two counts: (1) Count I alleges that in terminating his Section 8 homeownership option benefits despite the Hearing Officer's ruling in his favor, Defendants exceeded their statutory authority and violated his statutory and regulatory rights; and, (2) Count II alleges that in refusing to pay his Section 8 homeownership option subsidy despite the Hearing Officer's rulings, Defendants violated his due process rights. *Id.* at 6. Mr. Miller seeks reimbursement of the money he spent out of pocket to cover the portion of his mortgage payment that would have been paid by his Section 8 homeownership option subsidy, and he asks for preliminary and permanent injunctions ordering Defendants to reinstate him to the Section 8 homeownership option and pay his Section 8 benefits effective immediately.

### C.   The Defendants' Response

Defendants answered the Complaint, denying its essential allegations, and asserted a Counterclaim on the theory of unjust enrichment, seeking reimbursement for amounts they had expended for Section 8 benefits before termination. They allege that Mr. Miller is required to register as a sex offender for his lifetime and he is therefore ineligible for Section 8 benefits; therefore, they claim it is inequitable for him to retain Section 8 funds that he has already improperly received. Defendants also assert the affirmative defenses of qualified immunity and

unclean hands.  *Answer of Defs. Dale McCormick, Maine State Housing Authority and Penquis Community Action Program*; *Countercl.* (Docket # 10).

### D.     The Dispositive Motions

#### 1.     The Miller Motion to Dismiss

On April 15, 2008, Mr. Miller moved to dismiss the Counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6).  *Pl.'s Mot. to Dismiss Countercl.*  Mr. Miller asserted that the Counterclaim was grounded on fundamental misconceptions.  He pointed out that the Section 8 regulations distinguish between an "applicant" and a "participant": an applicant is a "family that has applied for admission to a program but is not yet a participant in the program"; and a "participant" is "a family that has been admitted to the [Public Housing Agency (PHA)] program and is currently assisted in the program."  *Id.* at 4 (citing 24 C.F.R. § 982.4(b)).  According to Mr. Miller, this distinction—between applicant and participant—is crucial to how the regulations treat a person who is subject to a lifetime registration requirement under a State sex offender registration program.[5]  Mr. Miller conceded that under 24 C.F.R. § 982.553(a)(2)(i), a lifetime registrant is prohibited from admission into the Section 8 Voucher Program.  *Id.* at 5.  However, Mr. Miller asserted that if a lifetime registrant is admitted and becomes a participant in the program, his lifetime registrant status is not a ground for termination of benefits.  *Id.* at 6 (citing 24 C.F.R. § 982.553(b)).  Noting that he was accepted into the Section 8 program in Massachusetts and moved to Maine as a participant, Mr. Miller claimed that Maine does not have the regulatory right to re-determine his eligibility for Section 8 benefits.  *Id.* at 5 (citing 24 C.F.R. § 982.355).  Mr. Miller concluded that "although lifetime sex offender registration status

---

[5] The regulation requires prohibition of admission to the program "if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program."  24 C.F.R. § 982.553(a)(2)(i). For the purposes of this Order, the Court refers to the prohibited household member's status as that of a "lifetime registrant."  In so doing, the Court does not differentiate between convicted sex offenders who have in fact registered as lifetime registrants, and those who have not, but are required to do so.

can be a ground for denial of admission, it cannot be a ground for termination of participation." *Id.* at 7.

### 2.    The Miller Motion for Summary Judgment

On July 3, 2008, Mr. Miller moved for summary judgment on a stipulated record.  *Pl.'s Mot. for Summ. J.*  Mr. Miller raised a number of issues, including:  (1) whether the regulations allow Defendants to ignore the Hearing Officer's decision; (2) whether the Hearing Officer committed an error of law; (3) whether Mr. Miller is properly classified as a lifetime registrant; and, (4) whether the regulation that prohibits the admission of lifetime registrants into the Section 8 program allows for termination of a participant's Section 8 benefits if the participant was a lifetime registrant when he was lawfully admitted into the program.  *Id.* at 6-16.

### 3.    The Defendants' Responses

On May 2, 2008, Defendants responded to Mr. Miller's motion to dismiss the Counterclaim.  *Resp. to Pl.'s Mot. to Dismiss Countercl. for Failure to State a Claim upon which Relief Can Be Granted* (Docket # 16).  In defense of the Counterclaim, Defendants observed that had Mr. Miller registered as a sex offender when he moved to Maine, Penquis never would have subsidized his purchase of the house.  They contended that he should not be allowed to benefit from his inequitable conduct.  *Id.* at 4.

On July 31, 2008, Defendants responded to Mr. Miller's motion for summary judgment. Defendants first asserted that the regulations do allow them to disregard a Hearing Officer's decision, if the decision is faulty.  *Defs.' Resp. to Pl.'s Mot. for Summ. J.* at 1-2 (Docket # 25) (citing 24 C.F.R. § 982.555(f)).  They then claimed that the Hearing Officer had committed an error of law in determining that Mr. Miller was not subject to lifetime sex offender registration and they sought to demonstrate that Mr. Miller is subject to lifetime registration under state of

Maine law.  *Id.* at 2-5.  They argued that even if Mr. Miller was not guilty of fraud in failing to disclose his sex offender registration status in Massachusetts, he is still receiving benefits under circumstances that make it inequitable for him to retain them.  *Id.* at 5-6.

### 4.    The Defendants' Motion for Judgment on a Stipulated Record

Relying on the same arguments in the point and counterpoints in the Plaintiff's dispositive motions, Defendants moved for judgment on the stipulated record.  *Defs.' Mot. for J.*  Contending that Mr. Miller is a lifetime registrant and lifetime registrants are ineligible for Section 8 housing, Defendants claimed they are entitled to judgment on the stipulated record.  *Id.* at 4-9.  Any other interpretation of the regulations would lead, according to Defendants, to "absurd results."  *Id.* at 8.

### 5.    Mr. Miller's Response

Standing by his earlier arguments, Mr. Miller denied that drawing a distinction between applicants and participants would lead to absurd results.  *Pl.'s Resp. to Defs.' Mot. for J. on a Stipulated R.* at 5-6 (Docket # 24).  He also sought to distinguish the cases and law review article Defendants relied upon in their memorandum.  *Id.* at 3-5.

### E.    The Recommended Decision

On September 22, 2008, the Magistrate Judge issued her Recommended Decision on the pending cross-motions for judgment.[6]  *Rec. Dec.*

### 1.    Lifetime Sex Offender Registration

After reviewing Maine State law, the Magistrate Judge concluded that Mr. Miller is subject to lifetime sex offender registration as a result of his state of Washington conviction for child molestation in the first degree.  *Id.* at 9-12.  She described the Hearing Officer's conclusion

---

[6] Pursuant to an agreement of counsel, the Magistrate Judge reserved ruling on Mr. Miller's motion to dismiss "until the issues of the underlying complaint have been resolved."  *Report of Telephone Conf. and Order* (Docket # 18). As the Court explains *infra* Part II.G, Mr. Miller's motion to dismiss is dismissed without prejudice.

to the contrary as "erroneous," and noted that it was based on the "untenable" presumption that he was not a lifetime registrant because the Massachusetts Public Housing Authority decided to admit him. *Id.* at 9-10.

### 2.  The Regulatory Support for Termination

Relying on 24 C.F.R. § 982.553(c), the Magistrate Judge observed that this regulation allows the PHA to terminate Section 8 benefits "'for criminal activity by a household member as authorized in this section if the PHA determines, based on a preponderance of the evidence, that the household member has engaged in the activity.'" *Id.* at 8 (quoting 24 C.F.R. § 982.553(c)). Once Defendants presented a certified copy of the state of Washington conviction, the Magistrate Judge concluded they had met the burden of proof to demonstrate that Mr. Miller had engaged in criminal activity resulting in a lifetime registration requirement and, therefore, Penquis was within its regulatory authority to terminate benefits, so long as it gave Mr. Miller "'an opportunity to dispute the accuracy and relevance of that record.'" *Id.* (quoting 24 C.F.R. § 982.553(d)(2)).  She noted that this interpretation of the "[a]t best" ambiguous regulation is consistent with HUD form 52649, which Penquis relied on in its first termination letter. *Id.* at 8 n.2.  The form states that the MSHA may terminate assistance if any "household member is subject to a lifetime registration requirement under a State sex offender registration program." *Stip. Ex.* 20 § 2.E; *see Rec. Dec.* at 3-4, 8 n.2, 12.  She concluded that his civil rights claims must fail. *Rec. Dec.* at 13-14.  Finally, she recommended that the Counterclaim be dismissed without prejudice. *Id.* at 14-15.

### F.      Objection and Response to the Recommended Decision

#### 1.      The Miller Objection

On October 2, 2008, Mr. Miller objected to the Magistrate Judge's Recommended Decision. *Pl.'s Obj.* Mr. Miller emphasizes that § 982.553(c), the section the Magistrate Judge relied upon, is "purely of procedural import and does not give independent authority to terminate benefits." *Id.* at 2. He speculates that the Magistrate Judge may believe that he "should have been denied admission to the program and hence that the Defendants retained the right to terminate his benefits for that reason." *Id.* at 4. He contends, however, that "the Defendants never raised as an issue that Mr. Miller was incorrectly admitted." *Id.* He also objects to the Magistrate Judge's reference to HUD form 52649 to bolster her conclusion. Mr. Miller observes that "a form cannot change federal regulations." *Id.* at 6. Further, by parsing the language in the form, he concludes it is "simply poorly written and ambiguous," and the Magistrate Judge's interpretation would contradict "clearly stated [HUD] policy." *Id.*

It remains unclear whether Mr. Miller is objecting to the Magistrate Judge's determination that under Maine law, he is required to register as a sex offender for life. Mr. Miller insists that it does not matter to his argument whether he is a ten-year or lifetime registrant, and that he has never denied his "general status as a registrant in his argument, only the translation of his Washington State status into Maine's registration scheme." *Id.* at 2 n.2.

#### 2.      The Defendants' Response

Defendants first contend that Mr. Miller failed to object to the Magistrate Judge's determination that he is a lifetime registrant. According to Defendants, this failure mandates the conclusion that they correctly refused to accept the Hearing Officer's decision to the contrary. *Defs.' Resp. to Pl.'s Obj.* at 2-3.

Defendants then argue that they had the discretion to terminate Mr. Miller as a lifetime registrant. *Id.* at 3-6. They point out that lifetime registrants are prohibited by federal statute from being admitted into Section 8 housing, and under federal statutory law, the Defendants would be prohibited from selling the home to Mr. Miller. *Id.* at 3 (citing 42 U.S.C. §§ 13663, 13664(a)(2)). They contend that "[i]f MaineHousing or any PHA has the ability to deny entry into the program under 24 C.F.R. § 982.553(a)(2)(i) and if owners and PHA's [sic] are prohibited from allowing such individuals into housing (and the Plaintiff concedes that both propositions are true), then they must have the ability to terminate such individuals who may be participants in the program without the PHA's knowledge." *Id.* at 4. They say that HUD form 52649 reflects the executive department's construction of the statutory scheme it is entrusted to administer and is entitled to "'considerable weight.'" *Id.* at 5 (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

## II. DISCUSSION

This case requires the Court to determine whether Defendants are liable to Mr. Miller for acting under color of law to deprive him of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *Bryson v. Shumway*, 308 F.3d 79, 88 (1st Cir. 2002). The narrow legal issue is whether Defendants had the authority to discontinue Mr. Miller's Section 8 mortgage subsidy because he is required to register as a sex offender.

### A. Lifetime Registration

A preliminary question is whether Mr. Miller is required to register as a sex offender for his lifetime pursuant to Maine law. The Magistrate Judge concluded he is. In his papers, Mr. Miller has made an equivocal objection, essentially saying that his registration status does not

make a legal difference. *Pl.'s Obj.* at 2. Defendants argue that Mr. Miller waived his right to contest the Magistrate Judge's determination that he is a lifetime registrant. *Defs.' Resp. to Pl.'s Obj.* at 2 (citing Fed. R. Civ. P. 72(b)(2)). During oral argument the Court pressed Mr. Miller's counsel as to whether he was objecting to the Magistrate Judge's conclusion that he is subject to lifetime registration. He was most reluctant to answer clearly. In excess of caution, with some misgivings as to whether Mr. Miller has properly preserved his objection, the Court is treating his cagey responses as an objection to the Magistrate Judge's conclusion on lifetime registration.

The Court adopts the Magistrate Judge's determination that Mr. Miller is a lifetime registrant under Maine law. 28 U.S.C. § 636(b)(1)(C); *Rec. Dec.* at 9-11 (comparing the elements of Mr. Miller's offense to 17-A M.R.S.A. § 255-A(1)(E-1), determining that his offense is a "sexually violent offense" pursuant to 34-A M.R.S.A. § 11203(7)(A), and concluding that he is a lifetime registrant under 34-A M.R.S.A. §§ 11203(8)(A), 11225-A(4)(A)); *see United States v. Stevens*, No. CR-08-36-B-W, 2009 U.S. Dist. LEXIS 13378, at *31-32 (D. Me. Feb. 19, 2009) (concluding that sexual assault in the second degree under Rhode Island law includes "the essential elements of a sex offense or a sexually violent offense" within the definition of 34-A M.R.S.A. §§ 11203(6)-(7), 11223).

### B.   Defendants' Right to Disregard Erroneous Decision

The Court also agrees with the Magistrate Judge that the corollary to the lifetime registration determination is also true—the Hearing Officer's decision on the term of Mr. Miller's sex offender registration requirement was incorrect, and pursuant to HUD regulation, the MSHA is not bound to follow it. As the Magistrate Judge noted, the MSHA is not bound by a hearing decision that is "[c]ontrary to HUD regulations or requirements, or otherwise contrary to federal, State, or local law." 24 C.F.R. § 982.555(f)(2).

However, Defendants are only half right when they say Mr. Miller bears the burden of proving that they "were not justified in refusing to be bound by the hearing officer's decision." *Defs.' Mot. for J.* at 4. The burden of persuasion is Mr. Miller's. But, even if he fails, as he has, in this burden, he may still prevail if he proves that by terminating his subsidy, Defendants deprived him of a right secured by the Constitution or laws of the United States. In other words, the Hearing Officer's ultimate conclusion could be right for the wrong reason.

**C.    Statutory and Regulatory Framework**

**1.    The Section 8 Program and the "Homeownership Option"**

In 1974, Congress amended the United States Housing Act of 1937 and established the Section 8 program "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." Housing and Community Development Act of 1974, Pub. L. No. 93-383, tit. II, § 201(a), 88 Stat. 633, 653, 662-666 (codified as amended at 42 U.S.C. § 1437f); *see Free v. Landrieu*, 666 F.2d 698, 699 n.1 (1st Cir. 1981). The Section 8 voucher program provides "tenant-based assistance" in the form of rental subsidies to private landlords. 42 U.S.C. § 1437f(o); *see Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 45 (1st Cir. 2000). Public housing authorities, such as the MSHA, administer the Section 8 program, 42 U.S.C. § 1437f(b)(1), and they not infrequently contract with non-profit entities, such as Penquis, to administer the program on their behalf. *See, e.g.*, 30-A M.R.S.A. §§ 4722(1), 4741(1)-(2) (empowering the MSHA "to make and execute contracts . . . necessary or convenient to the exercise" of its powers and perform its statutory functions in combination with private persons and corporations).

In 1992, Congress amended Section 8 by establishing the so-called "homeownership option," which provides that "a family receiving tenant-based assistance [under Section 8] may

receive assistance for occupancy of a dwelling owned by one or more members of the family." Housing and Community Development Act of 1992, Pub. L. No. 102-550, tit. I, § 185(a), 106 Stat. 3672, 3745-48 (codified as amended at 42 U.S.C. § 1437f(y)).  By qualifying for the "homeownership option" of Section 8, Mr. Miller was able to use his tenant-based assistance, which would otherwise subsidize rent, to repay his home loan.  42 U.S.C. § 1437f(y); 24 C.F.R. § 982.625-.643; s*ee Randal v. Boston Hous. Auth.*, No. 06-12120-RWZ, 2007 U.S. Dist. LEXIS 78219, at *1-2 (D. Mass. Sept. 19, 2007).  Counterintuitively, even though he purchased a home under the "homeownership option," Mr. Miller was receiving assistance payments under the Section 8 "tenant-based" assistance program before the MSHA stopped disbursing them.  *See* 24 C.F.R. §§ 982.4(b) (defining "program" as the "tenant-based assistance program"), 982.625(b) (explaining that "a family assisted under the homeownership option may be a newly admitted or existing participant in the program").

### 2.    Preliminary Concepts

#### a.    Mr. Miller's Status as a Program Participant

Another preliminary question is Mr. Miller's status within the Section 8 program.  HUD regulations draw a distinction between "applicant" and "participant."  An "applicant" is a "family that has applied for admission to a program but is not yet a participant in the program." 24 C.F.R. § 982.4(b).  A "participant" is a "family that has been admitted to the PHA program and is currently assisted in the program."  *Id.*  Mr. Miller argues he was a participant, not an applicant, when MSHA terminated his assistance payments, and the more rigorous regulatory standards that apply to participants apply to him.

He is correct.  When the MSHA terminated his assistance payments, Mr. Miller had been admitted to the program and the MSHA had been assisting him.  Mr. Miller's status as a

participant is confirmed by the parties' stipulation that he was "accepted as a participant" in the program in Massachusetts on October 1, 2002. *Stip. R.* ¶ 16; *see also Stip. Ex.* 25 at 1. Using the regulatory framework, Mr. Miller was an "applicant" for some period of time until he became a "participant" upon "admission" to the program on October 1, 2002.[7] Mr. Miller's status as a participant continued when he ported his voucher to Maine in 2005, and the Court concludes that as of his termination in May 2007, Mr. Miller was a "participant" in the Section 8 tenant-based assistance program.

### b.    The MSHA's Action as Termination of Assistance

Although the MSHA's three termination letters make clear that it was terminating Mr. Miller's assistance, the lexicon of HUD regulations requires that special care be taken in labeling.

> (a) Action or inaction by family.
> (1) A PHA may deny assistance for an applicant or terminate assistance for a participant under the programs because of the family's action or failure to act as described in this section or § 982.553. The provisions of this section do not affect denial or termination of assistance for grounds other than action or failure to act by the family.
> (2) Denial of assistance for an applicant may include any or all of the following: denying listing on the PHA waiting list, denying or withdrawing a voucher, refusing to enter into a HAP contract or approve a lease, and refusing to process or provide assistance under portability procedures.
> (3) Termination of assistance for a participant may include any or all of the following: refusing to enter into a HAP contract or approve a lease, terminating housing assistance payments under an outstanding HAP contract, and refusing to process or provide assistance under portability procedures.[8]

---

[7] Admission is "[t]he point when the family becomes a participant in the program. The date used for this purpose is the effective date of the first [housing assistance payments] contract for a family (first day of initial lease term) in a tenant-based program." 24 C.F.R. § 982.4(b).

[8] HUD has devised a vexing scheme wherein the words "denial" and "termination" are used in mutually exclusive contexts but have definitions that partially overlap. Confounding as it presently is, the distinction between "denial" and "termination" was even more confusing in the past. *See* Section 8 Certificate and Voucher Programs Conforming Rule, 60 Fed. Reg. 34,660, 34,687-88 (July 3, 1995) (codified as amended at 24 pts. 882, 887, 982, and 983). Under the old rule, PHAs could deny participants some things for some reasons, terminate their housing assistance payments for other reasons, and deny new applications for yet other reasons. *Id.* This was known as the "ABC" problem. Mercifully, the definitional difficulties here are different.

24 C.F.R. § 982.552(a)(1)-(3).  Recalling that Mr. Miller was a participant receiving payments when the MSHA informed him that his "voucher ha[d] been terminated," *Stip. Ex.* 26, the Court finds that the MSHA terminated his assistance under the rubric of § 982.552(a)(3) by "terminating housing assistance payments under an outstanding HAP contract."  *See Stip. Ex.* 21 (stating that pursuant to the parties' HAP contract, Penquis "will be paying $373 towards [Mr. Miller's] Home Ownership Mortgage").  The corollary to this finding is that the MSHA did not deny him assistance, and therefore the MSHA's action cannot fairly be characterized as a "denial" under § 982.552(a)(2).

### 3.      Lifetime Registrants, Illegal Drug Users, and Alcohol Abusers

In 1998, Congress enacted provisions barring from admission into federally assisted housing illegal drug users, alcohol abusers, and sex offenders subject to lifetime registration obligations under state law.  Quality Housing and Work Responsibility Act of 1998 (the 1998 Act), Pub. L. No. 105-276, tit. V, subtit. F, §§ 576-79, 112 Stat. 2461, 2639-43 (codified at 42 U.S.C. §§ 13661-64); *see Powell v. Hous. Auth. of the City of Pittsburgh*, 812 A.2d 1201, 1212-13 (Pa. 2002).  Specifically, 42 U.S.C. § 13663, entitled[9] "Ineligibility of dangerous sex offenders for admission to public housing," provides:

> (a) In general.  Notwithstanding any other provision of law, an owner of federally assisted housing shall prohibit admission to such housing for any household that includes any individual who is subject to a lifetime registration requirement under a State sex offender registration program.

42 U.S.C. § 13663(a).  A companion provision, entitled "Ineligibility of illegal drug users and alcohol abusers," was enacted at the same time:

> (b) Ineligibility of illegal drug users and alcohol abusers.

---

[9] *Cf. Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (noting that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute" (internal quotation omitted)); *United States v. Godin*, 534 F.3d 51, 59 (1st Cir. 2008) (stating that "[w]e may also look to the title of a statute to resolve ambiguity in the text"); *United States v. May*, 535 F.3d 912, 918 (8th Cir. 2008).

> (1) In general.  Notwithstanding any other provision of law, a public housing agency or an owner of federally assisted housing, as determined by the Secretary, shall establish standards that prohibit admission to the program or admission to federally assisted housing for any household with a member—
>
>> (A) who the public housing agency or owner determines is illegally using a controlled substance; or
>>
>> (B) with respect to whom the public housing agency or owner determines that it has reasonable cause to believe that such household member's illegal use (or pattern of illegal use) of a controlled substance, or abuse (or pattern of abuse) of alcohol, may interfere with the health, safety, or right to peaceful enjoyment of the premises by other residents.

42 U.S.C. § 13661(b).  These provisions target three populations that Congress wished to bar from federally assisted housing:  lifetime registrants, illegal drug users, and alcohol abusers.  Both provisions mandate that owners of federally assisted housing (in the case of lifetime registrants) and owners and PHAs (in the case of illegal drug users and alcohol abusers) "prohibit admission" to households with at least one member of the targeted population.

Critically, however, when it came to termination from participation in the program as opposed to admission into the program, Congress did not treat lifetime registrants the same way it treated illegal drug users and alcohol abusers.  With respect to *only* illegal drug users and alcohol abusers, Congress did not merely prohibit admission; it expressly required termination of their participation.  In a section, entitled "Termination of tenancy and assistance for illegal drug users and alcohol abusers in federally assisted housing," Congress mandated that owners and PHAs undertake to make changes to their standards and leases to allow for eviction or termination of assistance for these two target populations:

> (a) In general.  Notwithstanding any other provision of law, a public housing agency or an owner of federally assisted housing (as applicable), shall establish standards or lease provisions for continued assistance or occupancy in federally assisted housing that allow the agency or owner (as applicable) to terminate the tenancy or assistance for any household with a member—
>
>> (1) who the public housing agency or owner determines is illegally using a controlled substance; or

>    (2) whose illegal use (or pattern of illegal use) of a controlled substance, or whose abuse (or pattern of abuse) of alcohol, is determined by the public housing agency or owner to interfere with the health, safety, or right to peaceful enjoyment of the premises by other residents.

42 U.S.C. § 13662(a).  For whatever reason, however, there is no counterpart to § 13662(a) for lifetime sex offender registrants that requires their termination from participation once they have been admitted into the program.

Thus, the 1998 Act established a regime whereby owners were required to "prohibit admission" to lifetime registrants; owners and PHAs were mandated to "prohibit admission" to illegal drug users and alcohol abusers; and, owners and PHAs were required to establish standards to allow them to terminate the tenancies or assistance only for illegal drug users and alcohol abusers.

### 4.    Final HUD Regulations Implementing the 1998 Act

HUD promulgated final regulations implementing the 1998 Act on May 24, 2001. Screening and Eviction for Drug Abuse and Other Criminal Activity, 66 Fed. Reg. 28,776 (May 24, 2001) (codified at 24 C.F.R. pts. 5, 200, 247, 880, 882, 884, 891, 960, 966, and 982).  These regulations amended 24 C.F.R. §§ 982.551-.553, rules that (1) enumerate the obligations of Section 8 tenant-based assistance participants (§ 982.551), (2) provide for PHA denial or termination of tenant-based assistance (§ 982.552), and (3) describe specific circumstances under which a PHA must deny admission or terminate assistance for criminals and alcohol abusers (§ 982.553).  The parties agree that these regulations govern their dispute.[10]

---

[10] These regulations apply by cross-reference to Mr. Miller, who is covered under the "homeownership option." Another section of the regulations addresses the "homeownership option."  24 C.F.R. § 982.638(a)-(c).  According to this homeownership-specific regulation, a PHA may "deny or terminate homeownership assistance" in accordance with § 982.552 or § 982.553, or "deny or terminate assistance for violation of participant obligations described in § 982.551 or § 982.633."  *Id.*

The only reference to lifetime registrants in the regulations occurs in § 982.553 alongside references to illegal drug users and alcohol abusers—the other populations Congress focused on in the 1998 Act.  Subsection 982.553(a), entitled "Denial of admission," includes the prohibition on admission of lifetime registrants:

> (2)  Prohibiting admission of other criminals — (i)  Mandatory prohibition.  The PHA must establish standards that prohibit admission to the program if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program.  In this screening of applicants, the PHA must perform criminal history background checks necessary to determine whether any household member is subject to a lifetime sex offender registration requirement in the State where the housing is located and in other States where the household members are known to have resided.

24 C.F.R. § 982.553(a)(2)(i).  Subsection 982.553(a) also prohibits admission of illegal drug users and alcohol abusers.  *See* 24 C.F.R. § 982.553(a)(1)(ii)(A), (a)(2)(ii)(c)(3).  Overall, the subsection 982.553(a) prohibitions on admission of lifetime registrants, illegal drug users, and alcohol abusers faithfully implement the mandates of the 1998 Act.

So do the provisions in subsection 982.553(b), entitled "Terminating assistance."  PHAs are directed to terminate assistance for a family if any family member (1) is currently an illegal drug user, (2) has a pattern of illegal drug use that "interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents," or (3) abuses or has a pattern of abuse of alcohol that "may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents."  24 C.F.R. § 982.553(b)(1)(i), (b)(3).  The only other reasons a PHA may terminate assistance for a family under subsection 982.553(b) are if a family member has ever been convicted of specific drug-related criminal activity, or has violated the family's obligation not to engage in drug-related or violent criminal activity.

Significantly, consistent with the distinction Congress drew between drug users and alcohol abusers, on the one hand, and lifetime sex offender registrants, on the other, there is no

express provision in the regulations that authorizes termination of participation for lifetime registrants.

### D.   The Recommended Decision and Mr. Miller's Objection

The Magistrate Judge recognized that the regulations distinguish between denial of admission and termination of assistance. But, she relied on another subsection in § 982.553 that appears to blur the line between these two PHA actions. *Rec. Dec.* at 7-8. The Magistrate Judge concluded that subsection 982.553(c) of the regulations authorizes the MSHA's termination of Mr. Miller's assistance based on his status as a lifetime registrant, even though the regulations facially allow only for denial of his admission. *Id.* Subsection 982.553(c) provides that the PHA "may terminate assistance for criminal activity by a household member as authorized in this section if the PHA determines, based on a preponderance of the evidence, that the household member has engaged in the activity, regardless of whether the household member has been arrested or convicted for such activity." 24 C.F.R. § 982.553(c). Reasoning that subsection (c) refers to "criminal activity" without limitation, and that lifetime registrants are referenced elsewhere in § 982.553, the Magistrate Judge concluded that a PHA could terminate assistance if it determined that the participant committed an offense that required lifetime registration. *Rec. Dec.* at 8.

Mr. Miller's primary objection is that subsection (c) is procedural, not substantive. He argues that it does no more than clarify that the PHA's determination of criminal activity must be based on a preponderance of the evidence, and that the participant need not have been arrested for or convicted of the activity prior to termination. He further contends that subsection (c), which states that a PHA "may terminate assistance . . . as authorized in this section," explicitly

denies that it provides termination authority supplementary to subsection (b), entitled "Terminating assistance." *Pl.'s Obj.* at 2-4.

### E. Sustaining the Objection

The Court shares Mr. Miller's view that subsection (c) does not provide termination authority supplementary to § 982.553(b).   Section 982.553 is divided into five subsections. Subsection (a) lists the substantive grounds for "denial of assistance" to applicants.   Subsection (b) lists the substantive grounds for "terminating assistance" to participants.   Subsections (c) and (d) are procedural:   subsection (d) explains how PHAs may use criminal records and subsection (c) explains how a PHA may terminate benefits for criminal activity as authorized in subsection (b), when there has not been an arrest or conviction.   Subsection (e) incorporates regulations that protect victims of certain types of criminal activity.   The termination authority in § 982.553 does not include the authority the MSHA invokes here—termination of a participant who is subject to a lifetime registration requirement under state law.

With respect to lifetime registrants, the regulations merely mandate that PHAs establish standards that prohibit their admission to the tenant-based assistance program.   On its face, this obligation is circumscribed in three significant respects.    First, the regulations define "admission" as "[t]he point when the family becomes a participant in the program," 24 C.F.R. § 982.4(b), conclusively rendering the PHA's a one-time screening rather than ongoing monitoring role.   This language does not readily permit an interpretation that a participant may too be screened.

Further, the regulation limits the scope of a PHA's screening inquiry only to the PHA's home state and other states where members of the household are "known" to have resided.[11]   The

---

[11] In theory, were a PHA completely ignorant of an applicant's residential history, its inquiry would be confined to its own backyard.  It is difficult to imagine a more anemic implementation of a directive to prohibit from receiving

Court does not hesitate to characterize as modest the burden imposed on PHAs to screen applicant populations for lifetime registrants.  Indeed, it appears designed to allow for admission of lifetime registrants who hail from states "unknown."  It is not the Court's charge, however, to gauge the wisdom of HUD's regulations.  Applying them as they are written, the Court determines that they do not allow the MSHA to cull from the participant population lifetime registrants whom it could have denied admission.[12]

Third, once admitted, a family's status as a participant becomes portable and it may transfer its eligibility from jurisdiction to jurisdiction without undergoing a new eligibility assessment.  24 C.F.R. § 982.355.  The regulations provide that "[t]he receiving PHA does not redetermine elibibility [sic] for a portable family that was already receiving assistance in the initial PHA Section 8 tenant-based program." § 982.355(c)(1).  Once admitted in Massachusetts, Mr. Miller could move to Maine and the Maine PHA "must administer assistance for the family" without reassessing whether he was entitled to be admitted in the first place.  § 982.355(a), (c)(1).

---

federal assistance a population Congress has elsewhere gone to great lengths to keep track of.  *See* Adam Walsh Child Protection and Safety Act of 2006; Pub. L. No. 109-248, tit. I, 120 Stat. 587, 590-611 (codified in scattered sections of 42 U.S.C. and 18 U.S.C. § 2250).

[12] The cases Defendants cite are not to the contrary.  The first is not a Section 8 case.  *See Archdiocesan Hous. Auth. v. Demmings*, No. 46157-5-I, 2001 Wash. App. LEXIS 2276 (Wash. Ct. App. Oct. 15, 2001).  In *Demmings*, the court held that it was not unreasonable for a landlord to adopt and apply to current tenants a rule excluding convicted sex offenders from living in its apartments.  Citing the federal ban on admission of lifetime registrants as a "strong statement[] of public policy," the court reasoned that "a low-income landlord who is providing housing for vulnerable tenants can reasonably enact a rule to exclude convicted sex offenders." *Demmings*, 2001 Wash. App. LEXIS at *5.  *Demmings* is not on point.  The second, although a Section 8 case, is not on point, either.  *See In re Mayes*, No. 402858/07, 2007 N.Y. Misc. LEXIS 8098 (N.Y. Sup. Ct. Dec. 6, 2007).  In *Mayes*, police executed a search warrant in the Section 8 participant's dwelling, found cash, cocaine, and marijuana, and arrested the participant, her son, and her husband, who happened to be a convicted sex offender and whose residency in the dwelling was not PHA-approved.  2007 N.Y. Misc. LEXIS at *5-6; *see* 24 C.F.R. § 982.551(h)(2) (including among participant obligations, violation of which may result in termination, the requirement that only PHA-approved family members may reside in the dwelling).  The participant's tenancy was ultimately terminated not because she admitted her unauthorized, non-participant husband into her home, which charge was dismissed, but rather because her tenancy was "non-desirable" based on her involvement in drug activity.  *Id.* at *9-10.  Accordingly, the court in *Mayes* had no cause to consider whether a PHA may terminate assistance to a participant who is a lifetime registrant.

This interpretation of HUD's regulations is consistent with the MSHA Plan itself, which provides that "[a]n *applicant* and the applicant's household will be denied a voucher [if the] [a]pplicant or any household member is subject to a lifetime registration requirement under a sex offender or other sex crime registration program of the State of Maine or any other state." *Stip. Ex.* 12 at 7-8 (emphasis supplied).  Elsewhere, the Plan recites a host of "activities, conditions, or events" for which the MSHA may terminate a subsidy for a participant "[p]ursuant to 24 C.F.R. § 982.552(b) and § 982.553(b)." *Stip. Ex.* 13 at 19.  Although illegal drug use, drug-related criminal activity, violent criminal activity, alcohol abuse that threatens the safety of others, and criminal activity that threatens the safety of others are all included as reasons for termination, a participant's status as a lifetime registrant is not.

Defendants counter by citing the HUD form they referred to in their first termination letter, HUD-52649, on which the Magistrate Judge also relied, if cautiously.  *Stip. Ex.* 20; *see Rec. Dec.* at 3-4, 8 n.2, 12.   HUD-52649 states:   "The PHA may deny or terminate homeownership assistance . . . [if] [a]ny household member is subject to a lifetime registration requirement under a State sex offender registration program." *Stip. Ex.* 20 § 2.E.  Defendants contend that, even if Mr. Miller is correct and HUD-52649 is not controlling authority, "it clearly shows HUD's position on the issue." *Defs.' Resp. to Pl.'s Obj.* at 5.  But, HUD-52649 is contrary to HUD regulations addressing exactly the same areas.  First, as demonstrated above, neither § 982.552 nor § 982.553 permit a PHA to terminate assistance for a lifetime registrant; according to HUD-52649, a PHA may do so.  The form confers authority where none exists. Second, § 982.553(a)(2)(i) mandates denial of admission for lifetime registrants; according to HUD-52649, a PHA "may" deny admission to a lifetime registrant.  The form confers discretion where none exists.  "[W]here Congress has entrusted rulemaking and administrative authority to

an agency, courts normally accord the agency particular deference in respect to the interpretation of regulations promulgated under that authority." *Visiting Nurse Ass'n Gregoria Affuant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (internal quotation omitted).  However, courts are cautioned to withhold such deference "when the agency's interpretation of its regulation is plainly erroneous or inconsistent with its language." *Id.* (internal quotation omitted).  Even if the Court were to consider HUD-52649 to be HUD's interpretation of its own regulations, the Court concludes it is inconsistent with the language of the regulations.

Candidly observing that "[t]he C.F.R. does not specifically address the termination of assistance" to lifetime registrants, *Defs.' Mot. for J.* at 8, and unable to rely on either the MSHA Plan or HUD-52649, Defendants return to the statute as a source of authority to terminate Mr. Miller's benefits.  They argue that Congress could not have made any more clear its goal of prohibiting lifetime registrants from admission to federal housing.  *See* 42 U.S.C. § 13663(a). Defendants further argue that if owners are required to prohibit admission to lifetime registrants, and Congress's mandate does not distinguish between applicants and participants, then they must have the authority to terminate Mr. Miller's benefits.

The simple answer is that by its own terms, the statute is directed to prohibiting the admission of lifetime registrants, not to their removal from participation.  The statute reads "an owner of federally assisted housing *shall prohibit admission* to such housing for any household that includes any individual who is subject to a lifetime registration requirement under a State sex offender registration program." 42 U.S.C. § 13663(a) (emphasis supplied).  The statute says nothing about terminating assistance for lifetime registrants.  This omission becomes especially significant when the immediately preceding section of the law, 42 U.S.C. § 13662, is considered. Section 13662 explicitly addresses the termination of a public housing "tenancy or assistance"

for illegal drug users and alcohol abusers, but not lifetime registrants.   Thus, although the language of § 13663(a) provides unequivocal authority for denying a lifetime registrant admission into a Section 8 housing program, neither it nor any other provision of the statute authorizes what it does not mention—the termination of assistance for a lifetime registrant.

### F.   Policy Considerations

The Defendants strenuously argue that a decision that circumscribes their authority to terminate the participation of lifetime sex offender registrants in the Section 8 homeownership program has potentially disturbing implications.   The Court does not treat those objections lightly.  Congress's determination to prohibit the admission of lifetime registrants into Section 8 programs could not be clearer and the notion that, once a lifetime registrant somehow slips in, he cannot be removed is obscure public policy.   Further, it runs contrary to the manifest congressional intent found in other laws to monitor and restrict the activities of sex offenders, particularly those who—like Mr. Miller—have perpetrated offenses against children. *See* Adam Walsh Child Protection and Safety Act of 2006; Pub. L. No. 109-248, tit. I, 120 Stat. 587, 590-611 (codified in scattered sections of 42 U.S.C. and 18 U.S.C. § 2250) (the Sex Offender Registration and Notification Act, or SORNA).

Unlike the Hearing Officer, the Court draws little comfort from the age of Mr. Miller's conviction.   SORNA's and Maine's registration requirements reflect the national and state legislative concern about the need to protect children from people who have been convicted of perpetrating sex offenses against them.   *See* 42 U.S.C. § 16913(a) (SORNA); 34-A M.R.S.A. § 11222 (Maine sex offender registration statute).   Mr. Miller concedes he is required to register in Maine as a sex offender and there can be no doubt that these public policy concerns apply to him.

Yet, the Court does not make policy.   It can only interpret and apply the law and the regulations promulgated pursuant to the law.   Here, there may be a reason Congress differentiated

between drug users and alcohol abusers and lifetime registrants.   The law restricting Section 8 benefits was necessarily prospective and presumably when it was enacted, there were Section 8 beneficiaries who were drug users, alcohol abusers, and lifetime registrants.   For drug users and alcohol abusers, it was predictable they would use or abuse again, and thus subject themselves to termination under the new legislation by their own actions.   For lifetime registrants, however, except in rare circumstances, once a lifetime registrant always a lifetime registrant.   Congress could well have determined that the new law should not apply retroactively to past lifetime registrants, who were already participants in the program, and the most effective means of protecting the public would be to assure that no additional lifetime registrants were admitted to the Section 8 program.   If so, this determination avoided the unnerving prospect of administrative searches to root out participants who were lifetime registrants.

This is, admittedly, speculative.   There is no record of congressional intent underlying the distinctions in this legislation among drug users, alcohol abusers, and lifetime registrants,[13] and the Court could easily posit a host of policy considerations that would support applying the same restrictions and termination provisions with equal force to all.   But, it remains this Court's conviction that the statute and the regulations for whatever reason draw a distinction between these categories and it is the Court's obligation to honor and enforce those distinctions.

---

[13] The legislative history includes only a passing description of the provisions and, although laudatory, sheds no light on the issues in this case:

> [T]he Act improves tenant screening and eviction procedures against persons engaged in violent or drug-related crimes or behavior which disrupts the health, safety or right to peaceful enjoyment of the premises of other tenants or public housing employees. . . . Further, at my request, the Act includes provision [sic] to ban child molesters and sexually violent predators from receiving federal housing assistance.  To achieve this, local public housing agencies would be granted access to the Federal Bureau of Investigation's national database on sexually violent offenders, as well as State databases.  This improved records access provision is critical to ensuring that these offenders are properly screened out and prevented from endangering our children.

144 Cong. Rec. S11833, S11841 (1998) (statement of Sen. D'Amato).

### G.     The Remedy

As regards the remaining issues, the Court is uncomfortable with the current posture of the case.  Once the Magistrate Judge issued her Recommended Decision, the parties naturally focused their efforts nearly exclusively on whether she was correct.  Here, the Court agrees with Mr. Miller that the Recommended Decision was incorrect, but based on this record, it is not inclined to go further.

The remaining issues have not, in this Court's view, been adequately briefed and argued. Rather than rule definitively on an undeveloped record, the Court concludes it would benefit from further briefing and argument as to the remaining issues and it, therefore, dismisses all pending motions without prejudice.  The issues to be resolved include:  (1) whether there are other statutory or regulatory justifications for the Defendants' termination of Mr. Miller's Section 8 benefits; (2) whether Mr. Miller has demonstrated a violation of 42 U.S.C. § 1983; (3) what remedies are properly available; (4) whether Mr. Miller is equitably entitled to the relief he seeks; and, (5) the proper resolution of the Defendants' affirmative defenses.  The Court will schedule a conference of counsel to discuss how the case should proceed.

## III.     CONCLUSION

The Court SUSTAINS Plaintiff's Objection to the Recommended Decision of the Magistrate (Docket # 27) and REJECTS the Magistrate Judge's Recommended Decision on Cross-Motions (Docket # 26).  It concludes that 24 C.F.R. § 982.553(c) does not provide a regulatory basis justifying the termination of the Plaintiff's Section 8 housing benefits.  Because the merits of the pending motions on other issues have not been adequately briefed, the Court DISMISSES without prejudice the Plaintiff's Motion to Dismiss Counterclaim for Failure to State a Claim upon which Relief Can Be Granted (Docket # 13), Defendant's Motion for

Judgment on a Stipulated Record (Docket # 21), and Plaintiff's Motion for Summary Judgment on His Complaint (Docket # 22).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 26th day of March, 2009